# COPPERWELD CORP. ET AL. *v.* INDEPENDENCE TUBE CORP.

No. 82–1260.   Argued December 5, 1983—Decided June 19, 1984

*Erwin N. Griswold* argued the cause for petitioners. With him on the briefs were *William R. Jentes, Sidney N. Herman, Robert E. Shapiro,* and *Donald I. Baker.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Baxter, Deputy Assistant Attorney General Collins, Carolyn F. Corwin, Barry Grossman,* and *Nancy C. Garrison.*

*Victor E. Grimm* argued the cause for respondent. With him on the brief were *John R. Myers* and *Scott M. Mendel.**

---

*\*J. Randolf Wilson, Russell H. Carpenter, Jr., Stephen A. Bokat, Cynthia Wicker, William E. Blasier,* and *Quentin Riegel* filed a brief for the Chamber of Commerce of the United States et al. as *amici curiae* urging reversal.

A brief of *amici curiae* urging affirmance was filed for the State of Alabama et al. by *Robert K. Corbin,* Attorney General of Arizona, and *Richard A. Alcorn* and *Charles L. Eger,* Assistant Attorneys General; *Charles A. Graddick,* Attorney General of Alabama, and *Richard Owen,* Assistant Attorney General; *John Steven Clark,* Attorney General of Arkansas, and *Jeffrey A. Bell,* Assistant Attorney General; *Duane Woodard,* Attorney General of Colorado, and *Thomas P. McMahon,* Assistant Attorney General; *Neil F. Hartigan,* Attorney General of Illinois, and *Robert E. Davy,* Assistant Attorney General; *Thomas J. Miller,* Attorney General of Iowa, and *John R. Perkins,* Assistant Attorney General; *Robert T. Stephan,* Attorney General of Kansas, and *Wayne E. Hundley,* Deputy Attorney General; *Steven L. Beshear,* Attorney General of Kentucky, and *James M. Ringo,* Assistant Attorney General; *Hubert H. Humphrey III,* Attorney General of Minnesota, and *Stephen P. Kilgriff,* Assistant Attorney General; *Bill Allain,* Attorney General of Mississippi, and *Robert Sanders,* Special Assistant Attorney General; *Mike Greely,* Attorney General of Montana, and *Joe R. Roberts,* Assistant Attorney General; *Paul L. Douglas,* Attorney General of Nebraska, and *Dale A. Comer,* Assistant Attorney General; *Robert O. Wefald,* Attorney General of North Dakota, and *Alan C. Hoberg,* Assistant Attorney General; *Michael C. Turpen,* Attor-

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to determine whether a parent corporation and its wholly owned subsidiary are legally capable of conspiring with each other under § 1 of the Sherman Act.

## I

## A

The predecessor to petitioner Regal Tube Co. was established in Chicago in 1955 to manufacture structural steel

ney General of Oklahoma, and *James B. Franks*, Assistant Attorney General; *Dave Frohnmayer*, Attorney General of Oregon; *John J. Easton, Jr.*, Attorney General of Vermont, and *Glenn R. Jarrett*, Assistant Attorney General; *Ken Eikenberry*, Attorney General of Washington, *John R. Ellis*, Deputy Attorney General, and *Jon P. Ferguson*, Assistant Attorney General; *Bronson C. La Follette*, Attorney General of Wisconsin, and *Michael L. Zaleski*, Assistant Attorney General; *Joseph I. Lieberman*, Attorney General of Connecticut, and *Robert M. Langer*, Assistant Attorney General; *Charles M. Oberly*, Attorney General of Delaware, and *Vincent M. Amberly*, Deputy Attorney General; *James E. Tierney*, Attorney General of Maine, and *Stephen L. Wessler*, Senior Assistant Attorney General; *Stephen H. Sachs*, Attorney General of Maryland, and *Charles O. Monk II*, Assistant Attorney General; *Frank J. Kelley*, Attorney General of Michigan, and *Edwin M. Bladen*, Assistant Attorney General; *Paul Bardacke*, Attorney General of New Mexico; *Rufus L. Edmisten*, Attorney General of North Carolina, and *H. A. Cole, Jr.*, Special Deputy Attorney General; *Dennis J. Roberts II*, Attorney General of Rhode Island, and *Faith A. La-Salle*, Special Assistant Attorney General; *Mark V. Meierhenry*, Attorney General of South Dakota, and *Dennis R. Holmes*, Deputy Attorney General; *William M. Leech, Jr.*, Attorney General of Tennessee, and *William J. Haynes, Jr.*, Deputy Attorney General; *David L. Wilkinson*, Attorney General of Utah, *Stephen G. Schwendiman*, Chief, Assistant Attorney General, and *Suzanne M. Dallimore*, Assistant Attorney General; *A. G. McClintock*, Attorney General of Wyoming, and *Gay Vanderpoel*, Senior Assistant Attorney General; *Inez Smith Reid*, Acting Corporation Council for the District of Columbia, and *Francis S. Smith*, Assistant Corporation Council.

Briefs of *amici curiae* were filed for the Canadian Manufacturers Association et al. by *John DeQ. Briggs III*, *Scott E. Flick*, and *Jan Schneider;* and for Kaiser Aluminum & Chemical Corporation by *Milton Handler* and *John A. Moore*.

tubing used in heavy equipment, cargo vehicles, and construction. From 1955 to 1968 it remained a wholly owned subsidiary of C. E. Robinson Co. In 1968 Lear Siegler, Inc., purchased Regal Tube Co. and operated it as an unincorporated division. David Grohne, who had previously served as vice president and general manager of Regal, became president of the division after the acquisition.

In 1972 petitioner Copperweld Corp. purchased the Regal division from Lear Siegler; the sale agreement bound Lear Siegler and its subsidiaries not to compete with Regal in the United States for five years. Copperweld then transferred Regal's assets to a newly formed, wholly owned Pennsylvania corporation, petitioner Regal Tube Co. The new subsidiary continued to conduct its manufacturing operations in Chicago but shared Copperweld's corporate headquarters in Pittsburgh.

Shortly before Copperweld acquired Regal, David Grohne accepted a job as a corporate officer of Lear Siegler. After the acquisition, while continuing to work for Lear Siegler, Grohne set out to establish his own steel tubing business to compete in the same market as Regal. In May 1972 he formed respondent Independence Tube Corp., which soon secured an offer from the Yoder Co. to supply a tubing mill. In December 1972 respondent gave Yoder a purchase order to have a mill ready by the end of December 1973.

When executives at Regal and Copperweld learned of Grohne's plans, they initially hoped that Lear Siegler's noncompetition agreement would thwart the new competitor. Although their lawyer advised them that Grohne was not bound by the agreement, he did suggest that petitioners might obtain an injunction against Grohne's activities if he made use of any technical information or trade secrets belonging to Regal. The legal opinion was given to Regal and Copperweld along with a letter to be sent to anyone with whom Grohne attempted to deal. The letter warned that Copperweld would be "greatly concerned if [Grohne] contem-

plates entering the structural tube market . . . in competition with Regal Tube" and promised to take "any and all steps which are necessary to protect our rights under the terms of our purchase agreement and to protect the know-how, trade secrets, etc., which we purchased from Lear Siegler." Petitioners later asserted that the letter was intended only to prevent third parties from developing reliance interests that might later make a court reluctant to enjoin Grohne's operations.

When Yoder accepted respondent's order for a tubing mill on February 19, 1973, Copperweld sent Yoder one of these letters; two days later Yoder voided its acceptance. After respondent's efforts to resurrect the deal failed, respondent arranged to have a mill supplied by another company, which performed its agreement even though it too received a warning letter from Copperweld. Respondent began operations on September 13, 1974, nine months later than it could have if Yoder had supplied the mill when originally agreed.

Although the letter to Yoder was petitioners' most successful effort to discourage those contemplating doing business with respondent, it was not their only one. Copperweld repeatedly contacted banks that were considering financing respondent's operations. One or both petitioners also approached real estate firms that were considering providing plant space to respondent and contacted prospective suppliers and customers of the new company.

B

In 1976 respondent filed this action in the District Court against petitioners and Yoder.[1] The jury found that

---

[1] The chairman of the board and chief executive officer of both Copperweld and Regal, Phillip H. Smith, was also named as a defendant. In addition, respondents originally charged petitioners and Smith with an attempt to monopolize the market for structural steel tubing in violation of § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 2. Before

Copperweld and Regal had conspired to violate § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, but that Yoder was not part of the conspiracy. It also found that Copperweld, but not Regal, had interfered with respondent's contractual relationship with Yoder; that Regal, but not Copperweld, had interfered with respondent's contractual relationship with a potential customer of respondent, Deere Plow & Planter Works, and had slandered respondent to Deere; and that Yoder had breached its contract to supply a tubing mill.

At a separate damages phase, the judge instructed the jury that the damages for the antitrust violation and for the inducement of the Yoder contract breach should be identical and not double counted. The jury then awarded $2,499,009 against petitioners on the antitrust claim, which was trebled to $7,497,027. It awarded $15,000 against Regal alone on the contractual interference and slander counts pertaining to Deere. The court also awarded attorney's fees and costs after denying petitioners' motions for judgment n.o.v. and for a new trial.

## C

The United States Court of Appeals for the Seventh Circuit affirmed. 691 F. 2d 310 (1982). It noted that the exoneration of Yoder from antitrust liability left a parent corporation and its wholly owned subsidiary as the only parties to the § 1 conspiracy. The court questioned the wisdom of subjecting an "intra-enterprise" conspiracy to antitrust liability, when the same conduct by a corporation and an unincorpo-

trial respondent dismissed Smith as a defendant and dismissed its § 2 monopolization count.

Petitioners counterclaimed on the ground that respondent and Grohne had used proprietary information belonging to Regal, had competed unfairly by hiring away key Regal personnel, and had interfered with prospective business relationships by filing the lawsuit on the eve of a large Copperweld debenture offering. At the close of the evidence, the court directed a verdict against petitioners on their counterclaims. The disposition of these claims is not at issue before this Court.

rated division would escape liability for lack of the requisite two legal persons. However, relying on its decision in *Photovest Corp.* v. *Fotomat Corp.*, 606 F. 2d 704 (1979), cert. denied, 445 U. S. 917 (1980), the Court of Appeals held that liability was appropriate "when there is enough separation between the two entities to make treating them as two independent actors sensible." 691 F. 2d, at 318. It held that the jury instructions took account of the proper factors for determining how much separation Copperweld and Regal in fact maintained in the conduct of their businesses.[2] It also held that there was sufficient evidence for the jury to conclude that Regal was more like a separate corporate entity than a mere service arm of the parent.

We granted certiorari to reexamine the intra-enterprise conspiracy doctrine, 462 U. S. 1131 (1983), and we reverse.

## II

Review of this case calls directly into question whether the coordinated acts of a parent and its wholly owned subsidiary can, in the legal sense contemplated by § 1 of the Sherman Act, constitute a combination or conspiracy.[3] The so-called "intra-enterprise conspiracy" doctrine provides that § 1 liability is not foreclosed merely because a parent and its subsidiary are subject to common ownership. The doctrine derives from declarations in several of this Court's opinions.

---

[2] The jury was instructed to consider many different factors: for instance, whether Copperweld and Regal had separate management staffs, separate corporate officers, separate clients, separate records and bank accounts, separate corporate offices, autonomy in setting policy, and so on. The jury also was instructed to consider "any other facts that you find are relevant to a determination of whether or not Copperweld and Regal are separate and distinct companies." App. to Pet. for Cert. B–9.

[3] Section 1 of the Sherman Act provides in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony." 26 Stat. 209, as amended, 15 U. S. C. § 1.

In no case has the Court considered the merits of the intra-enterprise conspiracy doctrine in depth. Indeed, the concept arose from a far narrower rule. Although the Court has expressed approval of the doctrine on a number of occasions, a finding of intra-enterprise conspiracy was in all but perhaps one instance unnecessary to the result.

The problem began with *United States* v. *Yellow Cab Co.*, 332 U. S. 218 (1947). The controlling shareholder of the Checker Cab Manufacturing Corp., Morris Markin, also controlled numerous companies operating taxicabs in four cities. With few exceptions, the operating companies had once been independent and had come under Markin's control by acquisition or merger. The complaint alleged conspiracies under §§ 1 and 2 of the Sherman Act among Markin, Checker, and five corporations in the operating system. The Court stated that even restraints in a vertically integrated enterprise were not "necessarily" outside of the Sherman Act, observing that an unreasonable restraint

> "*may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent.* Similarly, any affiliation or integration flowing from an illegal conspiracy cannot insulate the conspirators from the sanctions which Congress has imposed. *The corporate interrelationships of the conspirators, in other words, are not determinative of the applicability of the Sherman Act. That statute is aimed at substance rather than form.* See *Appalachian Coals, Inc.* v. *United States*, 288 U. S. 344, 360–361, 376–377.
>
> "*And so in this case, the common ownership and control of the various corporate appellees are impotent to liberate the alleged combination and conspiracy from the impact of the Act.* The complaint charges that the restraint of interstate trade was not only effected by the combination of the appellees but was the primary object

of the combination. The theory of the complaint . . . is that 'dominating power' over the cab operating companies 'was not obtained by normal expansion . . . but by deliberate, calculated purchase for control.'" *Id.*, at 227–228 (emphasis added) (quoting *United States* v. *Reading Co.*, 253 U. S. 26, 57 (1920)).

It is the underscored language that later breathed life into the intra-enterprise conspiracy doctrine. The passage as a whole, however, more accurately stands for a quite different proposition. It has long been clear that a pattern of acquisitions may itself create a combination illegal under § 1, especially when an original anticompetitive purpose is evident from the affiliated corporations' subsequent conduct.[4] The *Yellow Cab* passage is most fairly read in light of this settled rule. In *Yellow Cab*, the affiliation of the defendants was irrelevant because the original acquisitions were *themselves* illegal.[5] An affiliation "flowing from an illegal conspiracy" would not avert sanctions. Common ownership and control were irrelevant because restraint of trade was "the primary object of the combination," which was created in a "'delib-

---

[4] Under the arrangements condemned in *Northern Securities Co.* v. *United States*, 193 U. S. 197, 354 (1904) (plurality opinion), "all the stock [a railroad holding company] held or acquired in the constituent companies was acquired and held to be used in suppressing competition between those companies. It came into existence only for that purpose." In *Standard Oil Co.* v. *United States*, 221 U. S. 1 (1911), and *United States* v. *American Tobacco Co.*, 221 U. S. 106 (1911), the trust or holding company device brought together previously independent firms to lessen competition and achieve monopoly power. Although the Court in the latter case suggested that the contracts between affiliated companies, and not merely the original combination, could be viewed as the conspiracy, *id.*, at 184, the Court left no doubt that "the combination in and of itself" was a restraint of trade and a monopolization, *id.*, at 187.

[5] Contrary to the dissent's suggestion, *post*, at 779, 788, n. 18, our point is not that *Yellow Cab* found only the initial acquisition illegal; our point is that the illegality of the initial acquisition was a predicate for its holding that any postacquisition conduct violated the Act.

erate, calculated'" manner.    Other language in the opinion is to the same effect.[6]

The Court's opinion relies on *Appalachian Coals, Inc.* v. *United States*, 288 U. S. 344 (1933); however, examination of that case reveals that it gives very little support for the broad doctrine *Yellow Cab* has been thought to announce. On the contrary, the language of Chief Justice Hughes speaking for the Court in *Appalachian Coals* supports a contrary conclusion.    After observing that "[t]he restrictions the Act imposes are not mechanical or artificial," 288 U. S., at 360, he went on to state:

---

[6] When discussing the fact that some of the affiliated Chicago operating companies did not compete to obtain exclusive transportation contracts held by another of the affiliated companies, the Court stated:

"[T]he fact that the competition restrained is that between affiliated corporations cannot serve to negative the statutory violation where, as here, *the affiliation is assertedly one of the means of effectuating the illegal conspiracy not to compete.*"    332 U. S., at 229 (emphasis added).

The passage quoted in text is soon followed by a cite to *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, 189 (1944).    *Crescent Amusement* found violations of §§ 1 and 2 by film exhibitors affiliated (in most cases) by 50 percent ownership.    The exhibitors used the monopoly power they possessed in certain towns to force film distributors to give them favorable terms in other towns.    The Court found it unnecessary to view the distributors as part of the conspiracy, *id.*, at 183, so the Court plainly viewed the affiliated entities themselves as the conspirators.    The *Crescent Amusement* Court, however, in affirming an order of divestiture, noted that such a remedy was appropriate when "creation of the combination is itself the violation."    *Id.*, at 189.    This suggests that both *Crescent Amusement* and *Yellow Cab*, which cited the very page on which this passage appears, stand for a narrow rule based on the original illegality of the affiliation.

The dissent misconstrues a later passage in *Crescent Amusement* stating that divestiture need not be limited to those affiliates whose "acquisition was part of the fruits of the conspiracy," 323 U. S., at 189.    See *post*, at 780–781.    This meant only that divestiture could apply to affiliates other than those who were driven out of business by the practices of the original conspirators and who were then acquired illegally to increase the combination's monopoly power.    See 323 U. S., at 181.    It did *not* mean that affiliates acquired for lawful purposes were subject to divestiture.

"The argument that integration may be considered a normal expansion of business, while a combination of independent producers in a common selling agency should be treated as abnormal—that one is a legitimate enterprise and the other is not—makes but an artificial distinction. The Anti-Trust Act aims at substance." *Id.*, at 377.[7]

As we shall see, *infra*, at 771–774, it is the intra-enterprise conspiracy doctrine itself that "makes but an artificial distinction" at the expense of substance.

The ambiguity of the *Yellow Cab* holding yielded the one case giving support to the intra-enterprise conspiracy doctrine.[8] In *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951), the Court held that two wholly owned subsidiaries of a liquor distiller were guilty under § 1 of the Sherman Act for jointly refusing to supply a wholesaler who declined to abide by a maximum resale pricing scheme. The Court offhandedly dismissed the defendants' argument

---

[7] *Appalachian Coals* does state that the key question is whether there is an unreasonable restraint of trade or an attempt to monopolize. "If there is, the combination cannot escape because it has chosen corporate form; and, if there is not, it is not to be condemned because of the absence of corporate integration." 288 U. S., at 377. *Appalachian Coals*, however, validated a cooperative selling arrangement among independent entities. The statement that intracorporate relationships would be subject to liability under § 1 is thus dictum. The statement may also envision merely the limited rule in *Yellow Cab* pertaining to acquisitions that are themselves anticompetitive.

[8] In two cases decided soon after *Yellow Cab* on facts similar to *Crescent Amusement*, see n. 6, *supra*, affiliated film exhibitors were found to have conspired in violation of § 1. *Schine Chain Theatres, Inc.* v. *United States*, 334 U. S. 110 (1948); *United States* v. *Griffith*, 334 U. S. 100 (1948). *Griffith* simply assumed that the companies were capable of conspiring with each other; *Schine* cited *Yellow Cab* and *Crescent Amusement* for the proposition, 334 U. S., at 116. In both cases, however, an intra-enterprise conspiracy holding was unnecessary not only because the Court found a § 2 violation, but also because the affiliated exhibitors had conspired with independent film distributors. See *ibid.*; *Griffith, supra*, at 103, n. 6, 109.

that "their status as 'mere instrumentalities of a single manu-facturing-merchandizing unit' makes it impossible for them to have conspired in a manner forbidden by the Sherman Act." *Id.*, at 215. With only a citation to *Yellow Cab* and no further analysis, the Court stated that the

> "suggestion runs counter to our past decisions that common ownership and control does not liberate cor-porations from the impact of the antitrust laws"

and stated that this rule was "especially applicable" when defendants "hold themselves out as competitors." 340 U. S., at 215.

Unlike the *Yellow Cab* passage, this language does not pertain to corporations whose initial affiliation was itself un-lawful. In straying beyond *Yellow Cab*, the *Kiefer-Stewart* Court failed to confront the anomalies an intra-enterprise doctrine entails. It is relevant nonetheless that, were the case decided today, the same result probably could be justi-fied on the ground that the subsidiaries conspired with wholesalers other than the plaintiff.[9] An intra-enterprise conspiracy doctrine thus would no longer be necessary to a finding of liability on the facts of *Kiefer-Stewart*.

Later cases invoking the intra-enterprise conspiracy doc-trine do little more than cite *Yellow Cab* or *Kiefer-Stewart*, and in none of the cases was the doctrine necessary to the re-sult reached. *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593 (1951), involved restrictive horizontal agree-

---

[9] Although the plaintiff apparently never acquiesced in the resale price maintenance scheme, *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 182 F. 2d 228, 231 (CA7 1950), rev'd, 340 U. S. 211 (1951), one of the subsidiaries did gain the compliance of other wholesalers after once termi-nating them for refusing to abide by the pricing scheme. See 182 F. 2d, at 231; 340 U. S., at 213. A theory of combination between the subsidiaries and the wholesalers could now support § 1 relief, whether or not it could have when *Kiefer-Stewart* was decided. See *Albrecht* v. *Herald Co.*, 390 U. S. 145, 149–150, and n. 6 (1968); *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960).

ments between an American corporation and two foreign corporations in which it owned 30 and 50 percent interests respectively. The *Timken* Court cited *Kiefer-Stewart* to show that "[t]he fact that there is common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws." 341 U. S., at 598. But the relevance of this statement is unclear. The American defendant in *Timken* did not own a majority interest in either of the foreign corporate conspirators and, as the District Court found, it did not control them.[10] Moreover, as in *Yellow Cab*, there was evidence that the stock acquisitions were themselves designed to effectuate restrictive practices.[11] The Court's reliance on the intra-enterprise conspiracy doctrine was in no way necessary to the result.

The same is true of *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134 (1968), which involved a conspiracy among a parent corporation and three subsidiaries to impose various illegal restrictions on plaintiff franchisees. The Court did suggest that, because the defendants

"availed themselves of the privilege of doing business through separate corporations, the fact of common own-

---

[10] See *United States* v. *Timken Roller Bearing Co.*, 83 F. Supp. 284, 311–312 (ND Ohio 1949), aff'd as modified, 341 U. S. 593 (1951). The agreement of an individual named Dewar, who owned 24 and 50 percent of the foreign corporations respectively, was apparently required for the American defendant to have its way.

[11] For almost 20 years before they became affiliated by stock ownership, two of the corporations had been party to the sort of restrictive agreements the *Timken* Court condemned. Three Justices upholding antitrust liability were of the view that Timken's "interests in the [foreign] companies were obtained as part of a plan to promote the illegal trade restraints" and that the "intercorporate relationship" was "the core of the conspiracy." *Id.*, at 600–601. Because two Justices found no antitrust violation at all, see *id.*, at 605 (Frankfurter, J., dissenting); *id.*, at 606 (Jackson, J., dissenting), and two Justices did not take part, apparently only Chief Justice Vinson and Justice Reed were prepared to hold that there was a violation even if the initial acquisition itself was not illegal. See *id.*, at 601–602 (Reed, J., joined by Vinson, C. J., concurring).

ership could not save them from any of the obligations that the law imposes on separate entities [citing *Yellow Cab* and *Timken*]." *Id.*, at 141–142.

But the Court noted immediately thereafter that "[i]n any event" each plaintiff could "clearly" charge a combination between itself and the defendants or between the defendants and other franchise dealers. *Ibid.* Thus, for the same reason that a finding of liability in *Kiefer-Stewart* could today be justified without reference to the intra-enterprise conspiracy doctrine, see n. 9, *supra*, the doctrine was at most only an alternative holding in *Perma Life Mufflers*.

In short, while this Court has previously seemed to acquiesce in the intra-enterprise conspiracy doctrine, it has never explored or analyzed in detail the justifications for such a rule; the doctrine has played only a relatively minor role in the Court's Sherman Act holdings.

### III

Petitioners, joined by the United States as *amicus curiae*, urge us to repudiate the intra-enterprise conspiracy doctrine.[12] The central criticism is that the doctrine gives undue significance to the fact that a subsidiary is separately incorporated and thereby treats as the concerted activity of two

---

[12] The doctrine has long been criticized. See, *e. g.*, Areeda, Intra-enterprise Conspiracy in Decline, 97 Harv. L. Rev. 451 (1983); Handler & Smart, The Present Status of the Intracorporate Conspiracy Doctrine, 3 Cardozo L. Rev. 23 (1981); Kempf, Bathtub Conspiracies: Has *Seagram* Distilled a More Potent Brew?, 24 Bus. Law. 173 (1968); McQuade, Conspiracy, Multicorporate Enterprises, and Section 1 of the Sherman Act, 41 Va. L. Rev. 183 (1955); Rahl, Conspiracy and the Anti-Trust Laws, 44 Ill. L. Rev. 743 (1950); Sprunk, Intra-Enterprise Conspiracy, 9 ABA Antitrust Section Rep. 20 (1956); Stengel, Intra-Enterprise Conspiracy Under Section 1 of the Sherman Act, 35 Miss. L. J. 5 (1963); Willis & Pitofsky, Antitrust Consequences of Using Corporate Subsidiaries, 43 N. Y. U. L. Rev. 20 (1968); Note, "Conspiring Entities" Under Section 1 of the Sherman Act, 95 Harv. L. Rev. 661 (1982); Note, Intra-Enterprise Conspiracy Under Section 1 of the Sherman Act: A Suggested Standard, 75 Mich. L. Rev. 717 (1977).

entities what is really unilateral behavior flowing from decisions of a single enterprise.

We limit our inquiry to the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act. We do not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own.

## A

The Sherman Act contains a "basic distinction between concerted and independent action." *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984). The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization.[13] It is not enough that a single firm appears to "restrain trade" unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster.[14] In part because it is sometimes difficult to

---

[13] Section 2 of the Sherman Act provides in pertinent part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 26 Stat. 209, as amended, 15 U. S. C. § 2.

By making a conspiracy to monopolize unlawful, § 2 does reach both concerted and unilateral behavior. The point remains, however, that purely unilateral conduct is illegal only under § 2 and not under § 1. Monopolization without conspiracy is unlawful under § 2, but restraint of trade without a conspiracy or combination is not unlawful under § 1.

[14] For example, the Court has declared that § 2 does not forbid market power to be acquired "as a consequence of a superior product, [or] business acumen." *United States* v. *Grinnell Corp.*, 384 U. S. 563, 571 (1966). We have also made clear that the "antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick Corp.* v. *Pueblo*

distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.

Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade effected by a "contract, combination . . . or conspiracy" between *separate* entities. It does not reach conduct that is "wholly unilateral." *Albrecht* v. *Herald Co.*, 390 U. S. 145, 149 (1968); accord, *Monsanto Co.* v. *Spray-Rite Corp.*, *supra*, at 761. Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2. Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused. See generally *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 5 (1958). Other combinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly, such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect. See, *e. g.*, *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977); *Chicago Board of Trade* v. *United States*, 246 U. S. 231 (1918). Whatever form the inquiry takes, however, it is not necessary to prove that concerted activity threatens monopolization.

The reason Congress treated concerted behavior more strictly than unilateral behavior is readily appreciated. Concerted activity inherently is fraught with anticompetitive

---

*Bowl-O-Mat, Inc.*, 429 U. S. 477, 488 (1977) (damages for violation of Clayton Act § 7) (quoting *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 320 (1962)).

risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

## B

The distinction between unilateral and concerted conduct is necessary for a proper understanding of the terms "contract, combination . . . or conspiracy" in § 1. Nothing in the literal meaning of those terms excludes coordinated conduct among officers or employees of the *same* company. But it is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively. For these reasons, officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.[15]

---

[15] See, *e. g.*, *Schwimmer* v. *Sony Corp. of America*, 677 F. 2d 946, 953 (CA2), cert. denied, 459 U. S. 1007 (1982); *Tose* v. *First Pennsylvania Bank, N. A.*, 648 F. 2d 879, 893–894 (CA3), cert. denied, 454 U. S. 893 (1981); *Morton Buildings of Nebraska, Inc.* v. *Morton Buildings, Inc.*, 531 F. 2d 910, 916–917 (CA8 1976); *Greenville Publishing Co.* v. *Daily Reflec-*

There is also general agreement that § 1 is not violated by the internally coordinated conduct of a corporation and one of its unincorporated divisions.[16] Although this Court has not previously addressed the question,[17] there can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor. The existence of an unincorporated division reflects no more than a firm's decision to adopt an organizational division of labor. A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself; a business enterprise establishes divisions to further its own interests in the most efficient manner. Because coordination between a corporation

---

tor, Inc., 496 F. 2d 391, 399 (CA4 1974) (dictum); *Chapman* v. *Rudd Paint & Varnish Co.*, 409 F. 2d 635, 643, n. 9 (CA9 1969); *Poller* v. *Columbia Broadcasting System, Inc.*, 109 U. S. App. D. C. 170, 174, 284 F. 2d 599, 603 (1960), rev'd on other grounds, 368 U. S. 464 (1962); *Nelson Radio & Supply Co.* v. *Motorola, Inc.*, 200 F. 2d 911, 914 (CA5 1952), cert. denied, 345 U. S. 925 (1953). Accord, Report of the Attorney General's National Committee to Study the Antitrust Laws 31 (1955). At the same time, many courts have created an exception for corporate officers acting on their own behalf. See, *e. g., H & B Equipment Co.* v. *International Harvester Co.*, 577 F. 2d 239, 244 (CA5 1978) (dictum); *Greenville Publishing, supra; Johnston* v. *Baker*, 445 F. 2d 424, 427 (CA3 1971).

Nothing in the language of the Sherman Act is inconsistent with the view that corporations cannot conspire with their own officers. It is true that a "person" under the Act includes both an individual and a corporation. 15 U. S. C. § 7. But § 1 does not declare every combination between two "persons" to be illegal. Instead it makes liable every "person" engaging in a combination or conspiracy "hereby declared to be illegal." As we note, the principles governing § 1 liability plainly exclude from unlawful combinations or conspiracies the activities of a single firm.

[16] See 691 F. 2d 310, 316 (CA7 1982) (decision below); *Cliff Food Stores, Inc.* v. *Kroger, Inc.*, 417 F. 2d 203, 205–206 (CA5 1969); *Joseph E. Seagram & Sons, Inc.* v. *Hawaiian Oke & Liquors, Ltd.*, 416 F. 2d 71, 83–84 (CA9 1969), cert. denied, 396 U. S. 1062 (1970); *Poller* v. *Columbia Broadcasting System, Inc.*, 109 U. S. App. D. C., at 174, 284 F. 2d, at 603.

[17] The Court left this issue unresolved in *Poller* v. *Columbia Broadcasting System, Inc.*, 368 U. S., at 469, n. 4.

and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not an activity that warrants § 1 scrutiny.

Indeed, a rule that punished coordinated conduct simply because a corporation delegated certain responsibilities to autonomous units might well discourage corporations from creating divisions with their presumed benefits. This would serve no useful antitrust purpose but could well deprive consumers of the efficiencies that decentralized management may bring.

## C

For similar reasons, the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

Indeed, the very notion of an "agreement" in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning. A § 1 agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co.* v. *United States*, 328 U. S. 781, 810 (1946). But in reality a parent and a wholly owned subsidiary *always* have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert

full control at any moment if the subsidiary fails to act in the parent's best interests.[18]

The intra-enterprise conspiracy doctrine looks to the form of an enterprise's structure and ignores the reality. Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary. A corporation has complete power to maintain a wholly owned subsidiary in either form. The economic, legal, or other considerations that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition.[19] Rather, a corporation may adopt the subsidiary form of organization for valid management and related purposes. Separate incorporation may im-

---

[18] As applied to a wholly owned subsidiary, the so-called "single entity" test is thus inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct. Followed by the Seventh Circuit below as well as by other Courts of Appeals, this test sets forth various criteria for evaluating whether a given parent and subsidiary are capable of conspiring with each other. See n. 2, *supra;* see generally *Ogilvie* v. *Fotomat Corp.*, 641 F. 2d 581 (CA8 1981); *Las Vegas Sun, Inc.* v. *Summa Corp.*, 610 F. 2d 614 (CA9 1979), cert. denied, 447 U. S. 906 (1980); *Photovest Corp.* v. *Fotomat Corp.*, 606 F. 2d 704 (CA7 1979), cert. denied, 445 U. S. 917 (1980). These criteria measure the "separateness" of the subsidiary: whether it has separate control of its day-to-day operations, separate officers, separate corporate headquarters, and so forth. At least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act. The factors simply describe the manner in which the parent chooses to structure a subunit of itself. They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be viewed as a single economic unit.

[19] Because an "agreement" between a parent and its wholly owned subsidiary is no more likely to be anticompetitive than an agreement between two divisions of a single corporation, it does not matter that the parent "availed [itself] of the privilege of doing business through separate corporations," *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 141 (1968). The purposeful choice of a parent corporation to organize a subunit as a subsidiary is not itself a reason to heighten antitrust scrutiny, because it is not laden with anticompetitive risk.

prove management, avoid special tax problems arising from multistate operations, or serve other legitimate interests.[20] Especially in view of the increasing complexity of corporate operations, a business enterprise should be free to structure itself in ways that serve efficiency of control, economy of operations, and other factors dictated by business judgment without increasing its exposure to antitrust liability. Because there is nothing inherently anticompetitive about a corporation's decision to create a subsidiary, the intra-enterprise conspiracy doctrine "impose[s] grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect." *Sunkist Growers, Inc.* v. *Winckler & Smith Citrus Products Co.*, 370 U. S. 19, 29 (1962).[21]

If antitrust liability turned on the garb in which a corporate subunit was clothed, parent corporations would be encouraged to convert subsidiaries into unincorporated divisions. Indeed, this is precisely what the Seagram company did after this Court's decision in *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951).[22] Such an

---

[20] For example, "[s]eparate incorporation may reduce federal or state taxes or facilitate compliance with regulatory or reporting laws. Local incorporation may also improve local identification. Investors or lenders may prefer to specialize in a particular aspect of a conglomerate's business. Different parts of the business may require different pension or profit-sharing plans or different accounting practices." Areeda, 97 Harv. L. Rev., at 453.

[21] *Sunkist Growers* provides strong support for the notion that separate incorporation does not necessarily imply a capacity to conspire. The defendants in that case were an agricultural cooperative, its wholly owned subsidiary, and a second cooperative comprising only members of the first. The Court refused to find a § 1 or § 2 conspiracy among them because they were "one 'organization' or 'association' even though they have formally organized themselves into three separate legal entities." 370 U. S., at 29. Although this holding derived from statutory immunities granted to agricultural organizations, the reasoning of *Sunkist Growers* supports the broader principle that substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1.

[22] See *Joseph E. Seagram & Sons, Inc.* v. *Hawaiian Oke & Liquors, Ltd.*, 416 F. 2d 71 (CA9 1969), cert. denied, 396 U. S. 1062 (1970).

incentive serves no valid antitrust goals but merely deprives consumers and producers of the benefits that the subsidiary form may yield.

The error of treating a corporate division differently from a wholly owned subsidiary is readily seen from the facts of this case. Regal was operated as an unincorporated division of Lear Siegler for four years before it became a wholly owned subsidiary of Copperweld. Nothing in this record indicates any meaningful difference between Regal's operations as a division and its later operations as a separate corporation. Certainly nothing suggests that Regal was a greater threat to competition as a subsidiary of Copperweld than as a division of Lear Siegler. Under either arrangement, Regal might have acted to bar a new competitor from entering the market. In one case it could have relied on economic power from other quarters of the Lear Siegler corporation; instead it drew on the strength of its separately incorporated parent, Copperweld. From the standpoint of the antitrust laws, there is no reason to treat one more harshly than the other. As Chief Justice Hughes cautioned, "[r]ealities must dominate the judgment." *Appalachian Coals, Inc.* v. *United States,* 288 U. S., at 360.[23]

D

Any reading of the Sherman Act that remains true to the Act's distinction between unilateral and concerted conduct will necessarily disappoint those who find that distinction arbitrary. It cannot be denied that § 1's focus on concerted

---

[23] The dissent argues that references in the legislative history to "trusts" suggest that Congress intended § 1 to govern the conduct of all affiliated corporations. See *post,* at 787–788. But those passages explicitly refer to combinations created for the very purpose of restraining trade. None of the cited debates refers to the postacquisition conduct of corporations whose initial affiliation was lawful. Indeed, Senator Sherman stated:

"It is the unlawful combination, tested by the rules of common law and human experience, that is aimed at by this bill, and not the lawful and useful combination." 21 Cong. Rec. 2457 (1890).

behavior leaves a "gap" in the Act's proscription against unreasonable restraints of trade. See *post*, at 789. An unreasonable restraint of trade may be effected not only by two independent firms acting in concert; a single firm may restrain trade to precisely the same extent if it alone possesses the combined market power of those same two firms. Because the Sherman Act does not prohibit unreasonable restraints of trade as such—but only restraints effected by a contract, combination, or conspiracy—it leaves untouched a single firm's anticompetitive conduct (short of threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability.

We have already noted that Congress left this "gap" for eminently sound reasons. Subjecting a single firm's every action to judicial scrutiny for reasonableness would threaten to discourage the competitive enthusiasm that the antitrust laws seek to promote. See *supra*, at 767–769. Moreover, whatever the wisdom of the distinction, the Act's plain language leaves no doubt that Congress made a purposeful choice to accord different treatment to unilateral and concerted conduct. Had Congress intended to outlaw unreasonable restraints of trade as such, § 1's requirement of a contract, combination, or conspiracy would be superfluous, as would the entirety of § 2.[24] Indeed, this Court has recog-

---

[24] Even if common-law intracorporate conspiracies were firmly established when Congress passed the Sherman Act, the obvious incompatibility of an intracorporate conspiracy with § 1 is sufficient to refute the dissent's suggestion that Congress intended to incorporate such a definition. See *post*, at 784–787. Moreover, it is far from clear that intracorporate conspiracies were recognized at common law in 1890. Even today courts disagree whether corporate employees can conspire with themselves or with the corporation for purposes of certain statutes, such as 42 U. S. C. § 1985(3). Compare, *e. g.*, *Novotny* v. *Great Am. Fed. Sav. & Loan Assn.*, 584 F. 2d 1235 (CA3 1978) (en banc), vacated and remanded on other grounds, 442 U. S. 366 (1979), with *Dombrowski* v. *Dowling*, 459 F. 2d 190 (CA7 1972). And in 1890 it was disputed whether a corporation could itself be guilty of a crime that required criminal intent, such as

nized that § 1 is limited to concerted conduct at least since the days of *United States* v. *Colgate & Co.*, 250 U. S. 300 (1919). Accord, *post*, at 789.

The appropriate inquiry in this case, therefore, is not whether the coordinated conduct of a parent and its wholly owned subsidiary may ever have anticompetitive effects, as the dissent suggests. Nor is it whether the term "conspiracy" will bear a literal construction that includes parent corporations and their wholly owned subsidiaries. For if these were the proper inquiries, a single firm's conduct would be subject to § 1 scrutiny whenever the coordination of two employees was involved. Such a rule would obliterate the Act's distinction between unilateral and concerted conduct, contrary to the clear intent of Congress as interpreted by the weight of judicial authority. See n. 15, *supra*. Rather, the appropriate inquiry requires us to explain the logic underlying Congress' decision to exempt unilateral conduct from § 1 scrutiny, and to assess whether that logic similarly excludes the conduct of a parent and its wholly owned subsidiary. Unless we second-guess the judgment of Congress to limit § 1 to concerted conduct, we can only conclude that the coordinated behavior of a parent and its wholly owned subsidiary falls outside the reach of that provision.

Although we recognize that any "gap" the Sherman Act leaves is the sensible result of a purposeful policy decision by Congress, we also note that the size of any such gap is open

---

conspiracy. Commentators appear to agree that courts began finding corporate liability for such crimes only around the turn of the century. See generally Edgerton, Corporate Criminal Responsibility, 36 Yale L. J. 827, 828, and n. 11 (1927); Miller, Corporate Criminal Liability: A Principle Extended to Its Limits, 38 Fed. Bar J. 49 (1979); Note, 60 Harv. L. Rev. 283, 284, and n. 9 (1946). Of course, Congress changed that common-law rule when it explicitly provided that a corporation could be guilty of a § 1 conspiracy. But the point remains that the Sherman Act did not import a pre-existing common-law tradition recognizing conspiracies between corporations and their own employees.

to serious question. Any anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine. A corporation's initial acquisition of control will always be subject to scrutiny under § 1 of the Sherman Act and § 7 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 18. Thereafter, the enterprise is fully subject to § 2 of the Sherman Act and § 5 of the Federal Trade Commission Act, 38 Stat. 719, 15 U. S. C. § 45. That these statutes are adequate to control dangerous anticompetitive conduct is suggested by the fact that not a single holding of antitrust liability by this Court would today be different in the absence of an intra-enterprise conspiracy doctrine. It is further suggested by the fact that the Federal Government, in its administration of the antitrust laws, no longer accepts the concept that a corporation and its wholly owned subsidiaries can "combine" or "conspire" under § 1.[25] Elimination of the intra-enterprise conspiracy doctrine with respect to corporations and their wholly owned subsidiaries will therefore not cripple antitrust enforcement. It will simply eliminate treble damages from private state tort suits masquerading as antitrust actions.

IV

We hold that Copperweld and its wholly owned subsidiary Regal are incapable of conspiring with each other for purposes of § 1 of the Sherman Act. To the extent that prior decisions of this Court are to the contrary, they are disapproved and overruled. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[25] "[T]he [intra-enterprise conspiracy] doctrine has played a relatively minor role in government enforcement actions, and the government has not relied on the doctrine in recent years." Brief for United States as *Amicus Curiae* 26, n. 42.

JUSTICE WHITE took no part in the consideration or decision of this case.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

It is safe to assume that corporate affiliates do not vigorously compete with one another. A price-fixing or market-allocation agreement between two or more such corporate entities does not, therefore, eliminate any competition that would otherwise exist. It makes no difference whether such an agreement is labeled a "contract," a "conspiracy," or merely a policy decision, because it surely does not unreasonably restrain competition within the meaning of the Sherman Act. The Rule of Reason has always given the courts adequate latitude to examine the substance rather than the form of an arrangement when answering the question whether collective action has restrained competition within the meaning of § 1.

Today the Court announces a new *per se* rule: a wholly owned subsidiary is incapable of conspiring with its parent under § 1 of the Sherman Act. Instead of redefining the word "conspiracy," the Court would be better advised to continue to rely on the Rule of Reason. Precisely because they do not eliminate competition that would otherwise exist but rather enhance the ability to compete, restraints which enable effective integration between a corporate parent and its subsidiary—the type of arrangement the Court is properly concerned with protecting—are not prohibited by § 1. Thus, the Court's desire to shield such arrangements from antitrust liability provides no justification for the Court's new rule.

In contrast, the case before us today presents the type of restraint that has precious little to do with effective integration between parent and subsidiary corporations. Rather, the purpose of the challenged conduct was to exclude a potential competitor of the subsidiary from the market. The jury apparently concluded that the two defendant corporations—

Copperweld and its subsidiary Regal—had successfully delayed Independence's entry into the steel tubing business by applying a form of economic coercion to potential suppliers of financing and capital equipment, as well as to potential customers. Everyone seems to agree that this conduct was tortious as a matter of state law. This type of exclusionary conduct is plainly distinguishable from vertical integration designed to achieve competitive efficiencies. If, as seems to be the case, the challenged conduct was manifestly anticompetitive, it should not be immunized from scrutiny under § 1 of the Sherman Act.

I

Repudiation of prior cases is not a step that should be taken lightly. As the Court wrote only days ago: "[A]ny departure from the doctrine of *stare decisis* demands special justification." *Arizona* v. *Rumsey, ante,* at 212. It is therefore appropriate to begin with an examination of the precedents.

In *United States* v. *Yellow Cab Co.,* 332 U. S. 218 (1947), the Court explicitly stated that a corporate subsidiary could conspire with its parent:

> "The fact that these restraints occur in a setting described by the appellees as a vertically integrated enterprise does not necessarily remove the ban of the Sherman Act. The test of illegality under the Act is the presence or absence of an unreasonable restraint on interstate commerce. Such a restraint may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent." *Id.,* at 227.

The majority attempts to explain *Yellow Cab* by suggesting that it dealt only with unlawful acquisition of subsidiaries. *Ante,* at 761–762. But the Court mentioned acquisitions only as an additional consideration separate from the passage

quoted above,[1] and more important, the Court explicitly held that restraints imposed by the corporate parent on the affiliates that it *already* owned in themselves violated § 1.[2]

At least three cases involving the motion picture industry also recognize that affiliated corporations may combine or conspire within the meaning of § 1. In *United States* v. *Crescent Amusement Co.*, 323 U. S. 173 (1944), as the Court recognizes, *ante*, at 762, n. 6, the only conspirators were affiliated corporations. The majority's claim that the case involved only unlawful acquisitions because of the Court's comments concerning divestiture of the affiliates cannot be squared with the passage immediately following that cited by the majority, which states that there had been unlawful conduct going beyond the acquisition of subsidiaries:

> "That principle is adequate here to justify divestiture of all interest in some of the affiliates since their acquisition was part of the fruits of the conspiracy. *But the relief need not, and under these facts should not, be so restricted* [to divestiture]. The fact that the companies were affiliated induced joint action and agreement. Common control was one of the instruments in bringing about unity of purpose and unity of action and in making the conspiracy effective. If that affiliation continues,

---

[1] The language I have quoted, most of which is overlooked by the majority, makes it clear that the Court's adoption of the concept of conspiracy between affiliated corporations was unqualified. As the first word of the sentence indicates, the Court's following statement: "Similarly, any affiliation or integration flowing from an illegal conspiracy cannot insulate the conspirators from the sanctions which Congress has imposed," 332 U. S., at 227, expresses a separate if related point.

[2] "[B]y preventing the cab operating companies under their control from purchasing cabs from manufacturers other than CCM, the appellees deny those companies the opportunity to purchase cabs in a free, competitive market. The Sherman Act has never been thought to sanction such a conspiracy to restrain the free purchase of goods in interstate commerce." *Id.*, at 226–227 (footnote omitted).

there will be tempting opportunity for these exhibitors to continue to act in combination against the independents." 323 U. S., at 189–190 (emphasis supplied).

Similarly, in *Schine Chain Theatres, Inc.* v. *United States*, 334 U. S. 110 (1948), the Court held that concerted action by parents and subsidiaries constituted an unlawful conspiracy.[3] That was also the holding in *United States* v. *Griffith*, 334 U. S. 100, 109 (1948). The majority's observation that in these cases there were alternative grounds that could have been used to reach the same result, *ante*, at 763, n. 8, disguises neither the fact that the holding that actually appears in these opinions rests on conspiracy between affiliated entities, nor that today's holding is inconsistent with what was actually held in these cases.

In *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211 (1951), the Court's holding was plain and unequivocal:

"Respondents next suggest that their status as 'mere instrumentalities of a single manufacturing-merchandizing unit' makes it impossible for them to have conspired in a manner forbidden by the Sherman Act. But this suggestion runs counter to our past decisions that common ownership and control does not liberate corporations from the impact of the antitrust laws. *E. g. United States* v. *Yellow Cab Co.*, 332 U. S. 218. The rule is especially applicable where, as here, respondents hold themselves out as competitors." *Id.*, at 215.

---

[3] "[T]he combining of the open and closed towns for the negotiation of films for the circuit was a restraint of trade and the use of monopoly power in violation of § 1 and § 2 of the Act. The concerted action of the parent company, its subsidiaries, and the named officers and directors in that endeavor was a conspiracy which was not immunized by reason of the fact that the members were closely affiliated rather than independent. See *United States* v. *Yellow Cab Co.*, 332 U. S. 218, 227; *United States* v. *Crescent Amusement Co.*, 323 U. S. 173." 334 U. S., at 116.

This holding is so clear that even the Court, which is not wanting for inventiveness in its reading of the prior cases, cannot explain it away. The Court suggests only that today *Kiefer-Stewart* might be decided on alternative grounds, *ante*, at 764, ignoring the fact that today's holding is inconsistent with the ground on which the case actually was decided.[4]

A construction of the statute that reaches agreements between corporate parents and subsidiaries was again embraced by the Court in *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593 (1951),[5] and *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134 (1968).[6] The majority only notes that there might have been other grounds for decision available in these cases, *ante*, at 764–766, but again it cannot deny that its new rule is inconsistent with what the Court actually did write in these cases.

---

[4] In *Kiefer-Stewart*, Seagram unsuccessfully argued that *Yellow Cab* was confined to cases concerning unlawful acquisitions, see Brief for Respondents, O. T. 1950, No. 297, p. 21. Thus the *Kiefer-Stewart* Court considered and rejected exactly the same argument embraced by today's majority.

[5] "The fact that there is common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws. *E. g.*, *Kiefer-Stewart Co.* v. *Seagram & Sons*, [340 U. S.,] at 215. Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.' Perhaps every agreement and combination to restrain trade could be so labeled." 341 U. S., at 598.

[6] "There remains for consideration only the Court of Appeals' alternative holding that the Sherman Act claim should be dismissed because respondents were all part of a single business entity and were therefore entitled to cooperate without creating an illegal conspiracy. But since respondents Midas and International availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities. See *Timken Co.* v. *United States*, 341 U. S. 593, 598 (1951); *United States* v. *Yellow Cab Co.*, 332 U. S. 218, 227 (1947)." 392 U. S., at 141–142.

Thus, the rule announced today is inconsistent with what this Court has held on at least seven previous occasions.[7] Perhaps most illuminating is the fact that until today, whether they favored the doctrine or not, it had been the universal conclusion of both the lower courts[8] and the commentators[9] that this Court's cases establish that a parent

[7] Also pertinent is *United States* v. *Citizens & Southern National Bank*, 422 U. S. 86 (1975), in which the Court wrote:

"The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors. This Court has held that even commonly owned firms must compete against each other, if they hold themselves out as distinct entities. 'The corporate interrelationships of the conspirators . . . are not determinative of the applicability of the Sherman Act.' *United States* v. *Yellow Cab Co.*, 332 U. S. 218, 227. See also *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211, 215; *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593, 598; *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 141–142." *Id.*, at 116–117.

[8] See, *e. g.*, *William Inglis & Sons Baking Co.* v. *ITT Continental Baking Co.*, 668 F. 2d 1014, 1054 (CA9), cert. denied, 459 U. S. 825 (1982); *Ogilvie* v. *Fotomat Corp.*, 641 F. 2d 581, 587–588 (CA8 1981); *Las Vegas Sun, Inc.* v. *Summa Corp.*, 610 F. 2d 614, 617–618 (CA9 1979), cert. denied, 447 U. S. 906 (1980); *Photovest Corp.* v. *Fotomat Corp.*, 606 F. 2d 704, 726 (CA7 1979), cert. denied, 445 U. S. 917 (1980); *Columbia Metal Culvert Co.* v. *Kaiser Aluminum & Chemical Corp.*, 579 F. 2d 20, 33–35, and n. 49 (CA3), cert. denied, 439 U. S. 876 (1978); *H & B Equipment Co.* v. *International Harvester Co.*, 577 F. 2d 239, 244–245 (CA5 1978); *George R. Whitten, Jr., Inc.* v. *Paddock Pool Builders, Inc.*, 508 F. 2d 547, 557 (CA1 1974), cert. denied, 421 U. S. 1004 (1975).

[9] See, *e. g.*, Report of the Attorney General's National Committee to Study the Antitrust Laws 30–36 (1955) (hereinafter cited as Attorney General's Committee Report); L. Sullivan, Law of Antitrust § 114 (1977); Areeda, Intraenterprise Conspiracy in Decline, 97 Harv. L. Rev. 451 (1983); Handler, Through the Antitrust Looking Glass—Twenty-First Annual Antitrust Review, 57 Calif. L. Rev. 182, 182–193 (1969); Handler & Smart, The Present Status of the Intracorporate Conspiracy Doctrine, 3 Cardozo L. Rev. 23, 26–61 (1981); McQuade, Conspiracy, Multicorporate Enterprises, and Section 1 of the Sherman Act, 41 Va. L. Rev. 183, 188–212 (1955); Willis & Pitofsky, Antitrust Consequences of Using Corporate Subsidiaries, 43 N. Y. U. L. Rev. 20, 22–24 (1968); Comment,

and a wholly owned subsidiary corporation are capable of conspiring in violation of § 1.   In this very case the Court of Appeals observed:

> "[T]he salient factor is that the Supreme Court's decisions, while they need not be read with complete literalism, of course they cannot be ignored.   It is no accident that every Court of Appeals to consider the question has concluded that a parent and its subsidiary have the same capacity to conspire, whether or not they can be found to have done so in a particular case."   691 F. 2d 310, 317 (CA7 1982) (footnotes omitted).

Thus, we are not writing on a clean slate.   "[W]e must bear in mind that considerations of *stare decisis* weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation." *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 736 (1977).[10] There can be no doubt that the Court today changes what has been taken to be the long-settled rule: a rule that Congress did not revise at any point in the last four decades.   At a minimum there should be a strong presumption against the approach taken today by the Court.   It is to the merits of that approach that I now turn.

## II

The language of § 1 of the Sherman Act is sweeping in its breadth: "Every contract, combination in the form of trust or

---

Intraenterprise Antitrust Conspiracy: A Decisionmaking Approach, 71 Calif. L. Rev. 1732, 1739–1745 (1983) (hereinafter cited as Comment, Decisionmaking); Comment, All in the Family: When Will Internal Discussions Be Labeled Intra-Enterprise Conspiracy?, 14 Duquesne L. Rev. 63 (1975); Note, "Conspiring Entities" Under Section 1 of the Sherman Act, 95 Harv. L. Rev. 661 (1982); Note, Intra-Enterprise Conspiracy Under Section 1 of the Sherman Act: A Suggested Standard, 75 Mich. L. Rev. 717, 718–727 (1977) (hereinafter cited as Note, Suggested Standard).

[10] See also *Monsanto Co.* v. *Spray-Rite Service Co.*, 465 U. S. 752, 769 (1984) (BRENNAN, J., concurring).

otherwise, or conspiracy, in restraint of trade or commerce among the several States, . . . is declared to be illegal." 15 U. S. C. § 1. This Court has long recognized that Congress intended this language to have a broad sweep, reaching any form of combination:

> "[I]n view of the many new forms of contracts and combinations which were being evolved from existing economic conditions, it was deemed essential by an all-embracing enumeration to make sure that no form of contract or combination by which an undue restraint of interstate or foreign commerce was brought about could save such restraint from condemnation. The statute under this view evidenced the intent not to restrain the right to make and enforce contracts, whether resulting from combination or otherwise, which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods, whether old or new, which would constitute an interference that is an undue restraint." *Standard Oil Co.* v. *United States*, 221 U. S. 1, 59–60 (1911).

This broad construction is illustrated by the Court's refusal to limit the statute to actual agreements. Even mere acquiescence in an anticompetitive scheme has been held sufficient to satisfy the statutory language.[11]

Since the statute was written against the background of the common law,[12] reference to the common law is particularly enlightening in construing the statutory requirement of a "contract, combination in the form of trust or otherwise, or conspiracy." Under the common law, the question whether

---

[11] See *Albrecht* v. *Herald Co.*, 390 U. S. 145, 149 (1968); *United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 44 (1960). See also *Monsanto Co.* v. *Spray-Rite Service Co.*, 465 U. S., at 764, n. 9.

[12] *E. g.*, *Associated General Contractors of California, Inc.* v. *Carpenters*, 459 U. S. 519, 531–532 (1983); *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 687–688 (1978); *Standard Oil*, 221 U. S., at 59.

affiliated corporations constitute a plurality of actors within the meaning of the statute is easily answered. The well-settled rule is that a corporation is a separate legal entity; the separate corporate form cannot be disregarded.[13] The Congress that passed the Sherman Act was well acquainted with this rule. See 21 Cong. Rec. 2571 (1890) (remarks of Sen. Teller) ("Each corporation is a creature by itself"). Thus it has long been the law of criminal conspiracy that the officers of even a single corporation are capable of conspiring with each other or the corporation.[14] This Court has held that a corporation can conspire with its employee,[15] and that a labor union can "combine" with its business agent within the meaning of § 1.[16] This concept explains the *Timken* Court's statement that the affiliated corporations in that case made

---

[13] See, *e. g., Schenley Corp.* v. *United States*, 326 U. S. 432, 437 (1946) *(per curiam); New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, 440–442 (1934); *Burnet* v. *Clark*, 287 U. S. 410 (1932); *Louisville, C. & C. R. Co.* v. *Letson*, 2 How. 497, 558–559 (1844); *Bank of the United States* v. *Deveaux*, 5 Cranch 61 (1809).

[14] Attorney General's Committee Report, *supra* n. 9, at 30–31 (citing *Barron* v. *United States*, 5 F. 2d 799 (CA1 1925); *Mininsohn* v. *United States*, 101 F. 2d 477 (CA3 1939); *Egan* v. *United States*, 137 F. 2d 369 (CA8), cert. denied, 320 U. S. 788 (1943)). See also, *e. g., United States* v. *Hartley*, 678 F. 2d 961, 971–972 (CA11 1982), cert. denied, 459 U. S. 1170 (1983); *Alamo Fence Co. of Houston* v. *United States*, 240 F. 2d 179 (CA5 1957); *Patterson* v. *United States*, 222 F. 599, 618–619 (CA6), cert. denied, 238 U. S. 635 (1915); *Union Pacific Coal Co.* v. *United States*, 173 F. 737 (CA8 1909); *United States* v. *Consolidated Coal Co.*, 424 F. Supp. 577, 579–581 (SD Ohio 1976); *United States* v. *Griffin*, 401 F. Supp. 1222, 1224–1225 (SD Ind. 1975), aff'd mem. *sub nom. United States* v. *Metro Management Corp.*, 541 F. 2d 284 (CA7 1976); *United States* v. *Bridell*, 180 F. Supp. 268, 273 (ND Ill. 1960); *United States* v. *Kemmel*, 160 F. Supp. 718 (MD Pa. 1958); Welling, Intracorporate Plurality in Criminal Conspiracy Law, 33 Hastings L. J. 1155, 1191–1199 (1982).

[15] See *Hyde* v. *United States*, 225 U. S. 347, 367–368 (1912). See also *United States* v. *Sampson*, 371 U. S. 75 (1962); *Fong Foo* v. *United States*, 369 U. S. 141 (1962) *(per curiam); Lott* v. *United States*, 367 U. S. 421 (1961); *Nye & Nissen* v. *United States*, 336 U. S. 613 (1949).

[16] See *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 465 (1921).

"agreements between legally separate persons," 341 U. S., at 598. Thus, today's holding that agreements between parent and subsidiary corporations involve merely unilateral conduct is at odds with the way that this Court has traditionally understood the concept of a combination or conspiracy, and also at odds with the way in which the Congress that enacted the Sherman Act surely understood it.

Holding that affiliated corporations cannot constitute a plurality of actors is also inconsistent with the objectives of the Sherman Act. Congress was particularly concerned with "trusts," hence it named them in § 1 as a specific form of "combination" at which the statute was directed. Yet "trusts" consisted of affiliated corporations. As Senator Sherman explained:

> "Because these combinations are always in many States and, as the Senator from Missouri says, it will be very easy for them to make a corporation within a State. So they can; but that is only one corporation of the combination. The combination is always of two or more, and in one case of forty-odd corporations, all bound together by a link which holds them under the name of trustees, who are themselves incorporated under the laws of one of the States." 21 Cong. Rec. 2569 (1890).

The activities of these "combinations" of affiliated corporations were of special concern:

> "[A]ssociated enterprise and capital are not satisfied with partnerships and corporations competing with each other, and have invented a new form of combination commonly called trusts, that seeks to avoid competition by combining the controlling corporations, partnerships, and individuals engaged in the same business, and placing the power and property of the combination under the government of a few individuals, and often under the control of a single man called a trustee, a chairman, or a president.

"The sole object of such a combination is to make competition impossible. It can control the market, raise or lower prices, as will best promote its selfish interests, reduce prices in a particular locality and break down competition and advance prices at will where competition does not exist. Its governing motive is to increase the profits of the parties composing it. The law of selfishness, uncontrolled by competition, compels it to disregard the interest of the consumer. It dictates terms to transportation companies, it commands the price of labor without fear of strikes, for in its field it allows no competitors. . . . It is this kind of a combination we have to deal with now." *Id.*, at 2457.[17]

Thus, the corporate subsidiary, when used as a device to eliminate competition, was one of the chief evils to which the Sherman Act was addressed.[18] The anomaly in today's holding is that the corporate devices most similar to the original "trusts" are now those which free an enterprise from antitrust scrutiny.

_____

[17] See also 21 Cong. Rec. 2562 (1890) (remarks of Sen. Teller); *id.*, at 2570 (remarks of Sen. Sherman); *id.*, at 2609 (remarks of Sen. Morgan).

[18] This legislative history thus demonstrates the error in the majority's conclusion that only acquisitions of corporate affiliates fall within § 1. See *ante*, at 761–762. The conduct of the trusts that Senator Sherman and others objected to went much further than mere acquisitions. Indeed, the irony of the Court's approach is that, had it been adopted in 1890, it would have meant that § 1 would have no application to trust combinations which had already been formed—the very trusts to which Senator Sherman was referring.

I cannot believe that the Court really intends to express doubt as to whether the Congress that passed the Sherman Act thought conspiracy doctrine could apply to corporations. *Ante*, at 775–776, n. 24. If that were not the case, then the Sherman Act would have no application to corporations. Since, as is clear and as the Court concedes, the Sherman Act does apply to corporations, there can be no doubt that Congress intended to apply the law of conspiracy to agreements between corporations.

### III

The Court's reason for rejecting the concept of a combination or conspiracy among a parent corporation and its wholly owned subsidiary is that it elevates form over substance—while in form the two corporations are separate legal entities, in substance they are a single integrated enterprise and hence cannot comprise the plurality of actors necessary to satisfy § 1. *Ante*, at 771–774. In many situations the Court's reasoning is perfectly sensible, for the affiliation of corporate entities often is procompetitive precisely because, as the Court explains, it enhances efficiency. A challenge to conduct that is merely an incident of the desirable integration that accompanies such affiliation should fail. However, the protection of such conduct provides no justification for the Court's new rule, precisely because such conduct cannot be characterized as an unreasonable restraint of trade violative of § 1. Conversely, the problem with the Court's new rule is that it leaves a significant gap in the enforcement of § 1 with respect to anticompetitive conduct that is entirely unrelated to the efficiencies associated with integration.

Since at least *United States* v. *Colgate & Co.*, 250 U. S. 300 (1919), § 1 has been construed to require a plurality of actors. This requirement, however, is a consequence of the plain statutory language, not of any economic principle. As an economic matter, what is critical is the presence of market power, rather than a plurality of actors.[19] From a competitive standpoint, a decision of a single firm possessing power to reduce output and raise prices above competitive levels has the same consequence as a decision by two firms acting together who have acquired an equivalent amount of market

---

[19] Market power is the ability to raise prices above those that would be charged in a competitive market. See *Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U. S. 2, 27, n. 46 (1984); *United States Steel Corp.* v. *Fortner Enterprises, Inc.*, 429 U. S. 610, 620 (1977); *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U. S. 377, 391 (1956).

power through an agreement not to compete.[20] Unilateral conduct by a firm with market power has no less anticompetitive potential than conduct by a plurality of actors which generates or exploits the same power,[21] and probably more, since the unilateral actor avoids the policing problems faced by cartels.

The rule of *Yellow Cab* thus has an economic justification. It addresses a gap in antitrust enforcement by reaching anticompetitive agreements between affiliated corporations which

---

[20] Significantly, the Court never suggests that the plurality-of-actors requirement has any intrinsic economic significance. Rather, it suggests that the requirement has evidentiary significance: combinations are more likely to signal anticompetitive conduct than is unilateral activity: "In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction." *Ante*, at 769. That is true, but it is also true of any ordinary commercial contract between separate entities, as can be seen if one substitutes the word "contract" for "conspiracy" in the passage I have quoted. The language of the Sherman Act indicates that it treats "contracts" and "conspiracies" as equivalent concepts—both satisfy the multiplicity-of-actors requirement—and yet one of the most fundamental points in antitrust jurisprudence, dating at least to *Standard Oil*, is that there is nothing inherently anticompetitive about a contract. Similarly, an agreement to act "for common benefit" in itself is unremarkable—all agreements are in some sense a restraint of trade be they contracts or conspiracies. It is only when trade is unreasonably restrained that § 1 is implicated. The Court's evidentiary concern lacks merit.

[21] We made this point in the context of resale price maintenance in *United States* v. *Parke, Davis & Co.*, 362 U. S. 29 (1960):

"The Sherman Act forbids combinations of traders to suppress competition. True, there results the same economic effect as is accomplished by a prohibited combination to suppress price competition if each customer, although induced to do so solely by a manufacturer's announced policy, independently decides to observe specified resale prices. So long as *Colgate* is not overruled, this result is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of a manufacturer's right 'freely to exercise his own independent discretion as to parties with whom he will deal.'" *Id.*, at 44 (quoting *Colgate*, 250 U. S., at 307).

have sufficient market power to restrain marketwide competition, but not sufficient power to be considered monopolists within the ambit of § 2 of the Act.[22]   The doctrine is also useful when a third party declines to join a conspiracy to restrain trade among affiliated corporations, and is harmed as a result through a boycott or similar tactics designed to penalize the refusal.   In such cases, since there has been no agreement with the third party, only an agreement between the affiliated corporations can be the basis for § 1 inquiry.[23] Finally, it must be remembered that not all persons who restrain trade wear grey flannel suits.   Businesses controlled by organized crime often attempt to gain control of an industry through violence or intimidation of competitors; in such cases § 1 can be applied to separately incorporated businesses which benefit from such tactics, but which may be ultimately controlled by a single criminal enterprise.[24]

---

[22] "[I]t is the potential which this conspiracy concept holds for the development of a rational enforcement policy which, if anything, will ultimately attract the courts.   If conduct of a single corporation which restrains trade were to violate Section 1, a forceful weapon would be available to the government with which to challenge conduct which in oligopolistic industries creates or reinforces entry barriers.   Excessive advertising in the cereal, drug, or detergent industries, annual style changes in the auto industry, and other such practices could be reached as soon as they threatened to inhibit competition; there would be no need to wait until a 'dangerous probability' of monopoly had been reached, the requirement under Section 2 'attempt' doctrine.   Nor would a single firm restraint of trade rule be overbroad.   It would in no way threaten single firm activity—setting a price, deciding what market it would deal in, or the like—which did not threaten competitive conditions."   L. Sullivan, *supra* n. 9, § 114, at 324 (footnotes omitted).

[23] This was the case in *Kiefer-Stewart*, for example.   Seagram had refused to sell liquor to Kiefer-Stewart unless it agreed to an illegal resale price maintenance scheme.   Kiefer-Stewart refused to agree, and as a result was injured by losing access to Seagram's products.   See 340 U. S., at 213.

[24] See *United States* v. *Turkette*, 452 U. S. 576, 588–593 (1981) (discussing congressional findings underlying the Organized Crime Control Act of 1970).   Section 1 of the Sherman Act has on occasion been used against

The rule of *Yellow Cab* and its progeny is not one that condemns every parent-subsidiary relationship. A single firm, no matter what its corporate structure may be, is not expected to compete with itself.[25] Functional integration by its very nature requires unified action; hence in itself it has never been sufficient to establish the existence of an unreasonable restraint of trade: "In discussing the charge in the *Yellow Cab* case, we said that the fact that the conspirators were integrated did not insulate them from the act, not that corporate integration violated the act." *United States* v. *Columbia Steel Co.*, 334 U. S. 495, 522 (1948). Restraints that act only on the parent or its subsidiary as a consequence of an otherwise lawful integration do not violate § 1 of the Sherman Act.[26] But if the behavior at issue is unrelated to any functional integration between the affiliated corporations and

---

various types of racketeering activity. See Hartwell, Criminal RICO and Antitrust, 52 Antitrust L. J. 311, 312–313 (1983); McLaren, Antitrust and Competition—Review of the Past Year and Suggestions for the Future, in New York State Bar Assn., 1971 Antitrust Law Symposium 1, 3 (1971).

[25] See Comment, Decisionmaking, *supra* n. 9, at 1753–1757; Note, Suggested Standard, *supra* n. 9, at 735–738. Professor Sullivan elaborates: "Picture, at one end of the spectrum, a family business which operates one retail store in each of three or four adjacent communities. All of the stores are managed as a unit by one individual, the founder of the business who sets policy, does all the buying, decides on all the advertising, sets prices, and hires and fires all employees other than family members. The fact that each store is operated by a separate corporation should not convert a family business into a cartel . . . . If there is, as a practical matter, an integrated ownership and management, this small business is a single firm. And a single firm cannot compete with itself. Hence it cannot restrain price competition with itself, or divide markets with itself, or act as a common purchasing agent for itself or otherwise restrain competition with itself, regardless of how many separate corporations the single firm may, for reasons unrelated to the act, be divided into." L. Sullivan, *supra* n. 9, § 114, at 326–327.

[26] Thus, the Court is wrong to suggest, *ante*, at 771–772, 774–776, and n. 24, that *Yellow Cab* could reach truly unilateral conduct involving only the employees of a single firm.

imposes a restraint on third parties of sufficient magnitude to restrain marketwide competition, as a matter of economic substance, as well as form, it is appropriate to characterize the conduct as a "combination or conspiracy in restraint of trade." [27]

For example, in *Yellow Cab* the Court read the complaint as alleging that integration had assisted the parent in excluding competing manufacturers from the marketplace, 332 U. S., at 226–227, leading the Court to conclude that "restraint of interstate trade was not only effected by the combination of the appellees but was the primary object of the combination." *Id.*, at 227. Similarly, in *Crescent Amusement* the Court noted that corporate affiliation between exhibitors enhanced their buying power and "was one of the instruments in . . . making the conspiracy effective" in excluding independents from the market. 323 U. S., at 189–190. Thus, in both cases the Court found that the affiliation enhanced the ability of the parent corporation to exclude the competition of third parties, and hence raised entry

---

[27] If the rule of *Yellow Cab* and its progeny could be easily circumvented through, for example, use of unincorporated divisions instead of subsidiaries, then there would be reason to question its efficacy as a tool for rational antitrust enforcement. However, the Court is incorrect when it asserts, *ante*, at 770–771, 772–774, that there is no economic substance in a distinction between unincorporated divisions, which cannot provide a plurality of actors, and wholly owned subsidiaries, which under *Yellow Cab* can. If that were the case, incorporated subsidiaries would never be used to achieve integration—the ready availability of an unincorporated alternative would always be employed in order to avoid antitrust liability. The answer is provided by the Court itself—the use of subsidiaries often makes possible operating efficiencies that are unavailable through the use of unincorporated divisions. *Ante*, at 772–774. We may confidently assume that any corporate parent whose contingent antitrust liability exceeds the savings it realizes through the use of subsidiaries already utilizes unincorporated divisions instead of corporate subsidiaries. Thus, it is more than merely a question of form when a decision is made to use corporate subsidiaries instead of unincorporated divisions, and the rule is not that easily circumvented.

barriers faced by actual and potential competitors. When conduct restrains trade not merely by integrating affiliated corporations but rather by restraining the ability of others to compete, that conduct has competitive significance drastically different from procompetitive integration.[28] In these cases, the affiliation assisted exclusionary conduct; it was not the competitive equivalent of unilateral integration but instead generated power to restrain marketwide competition.

There are other ways in which corporate affiliation can operate to restrain competition. A wholly owned subsidiary might market a "fighting brand" or engage in other predatory behavior that would be more effective if its ownership were concealed than if it was known that only one firm was involved. A predator might be willing to accept the risk of bankrupting a subsidiary when it could not afford to let a division incur similar risks. Affiliated corporations might enhance their power over suppliers by agreeing to refuse to deal with those who deal with an actual or potential com-

---

[28] See L. Sullivan, *supra* n. 9, § 114, at 328 ("To have two competitors acting concertedly two separate firms, not just persons, are needed. Thus 'concerted action' by two 'legal persons' which is limited solely to the internal management of a single firm does not restrain competition; but 'concerted action' by two 'legal persons' which erects barriers to entry by another separate firm, a competitor or potential competitor, can be a restraint of trade"); see also Willis & Pitofsky, *supra* n. 9, at 38–41. The Attorney General's National Committee to Study the Antitrust Laws made the same point in 1955:

"The substance of the Supreme Court decisions is that concerted action between a parent and subsidiary or between subsidiaries which has for its purpose or effect coercion or unreasonable restraint on the trade of strangers to those acting in concert is prohibited by Section 1. Nothing in these opinions should be interpreted as justifying the conclusion that concerted action solely between a parent and subsidiary or subsidiaries, the purpose and effect of which is not coercive restraint of the trade of strangers to the corporate family, violates Section 1. Where such concerted action restrains no trade and is designed to restrain no trade other than that of the parent and its subsidiaries, Section 1 is not violated." Attorney General's Committee Report, *supra* n. 9, at 34.

petitor of one of them; such a threat might be more potent coming from both corporations than from only one.[29]

In this case, it may be that notices to potential suppliers of respondent emanating from Copperweld carried more weight than would notices coming only from Regal. There was evidence suggesting that Regal and Copperweld were not integrated, and that the challenged agreement had little to do with achieving procompetitive efficiencies and much to do with protecting Regal's market position. The Court does not even try to explain why their common ownership meant that Copperweld and Regal were merely obtaining benefits associated with the efficiencies of integration. Both the District Court and the Court of Appeals thought that their agreement had a very different result—that it raised barriers to entry and imposed an appreciable marketwide restraint. The Court's discussion of the justifications for corporate affiliation is therefore entirely abstract—while it dutifully lists the procompetitive justifications for corporate affiliation, *ante*, at 772–774, it fails to explain how any of them relate to the conduct at issue in this case. What is challenged here is not the fact of integration between Regal and Copperweld, but their specific agreement with respect to Independence. That agreement concerned the exclusion of

---

[29] Professor Sullivan provides another example:

"[P]icture a parent corporation and its wholly owned subsidiary (or two corporations wholly owned by the same parent or stockholder group) which operate, respectively, a newspaper and a radio station in the same city. If the radio station, which has no local competitors, were to deny advertising to a local business because the latter advertised in a rival newspaper, the integration between the two corporations, however close in terms of ownership or management or both, would not protect them from a charge of conspiracy to restrain trade. . . . [T]he concerted action here involved is not merely carrying on the business of a single integrated firm, it is action which is aimed at restraining trade by utilizing such market power as is possessed by the firm because of its radio station in order to erect a competitive barrier in front of a competitor of the firm's newspaper." L. Sullivan, *supra* n. 9, § 114, at 327 (footnote omitted).

Independence from the market, and not any efficiency resulting from integration. The facts of this very case belie the conclusion that affiliated corporations are incapable of engaging in the kind of conduct that threatens marketwide competition. The Court does not even attempt to assess the competitive significance of the conduct under challenge here—it never tests its economic assumptions against the concrete facts before it. Use of economic theory without reference to the competitive impact of the particular economic arrangement at issue is properly criticized when it produces overly broad *per se* rules of antitrust liability;[30] criticism is no less warranted when a *per se* rule of antitrust immunity is adopted in the same way.

In sum, the question that the Court should ask is not why a wholly owned subsidiary should be treated differently from a corporate division, since the immunity accorded that type of arrangement is a necessary consequence of *Colgate*. Rather the question should be why two corporations that engage in a predatory course of conduct which produces a marketwide restraint on competition and which, as separate legal entities, can be easily fit within the language of § 1, should be immunized from liability because they are controlled by the same godfather. That is a question the Court simply fails to confront. I respectfully dissent.

---

[30] *E. g., Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977).