RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THE MEDICAL CENTER AT ELIZABETH PLACE, LLC,
           *Plaintiff-Appellant,*


           *v.*                                                        No. 14-4166


ATRIUM HEALTH SYSTEM, et al.,
           *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:12-cv-00026—Timothy S. Black, District Judge.

Argued: October 8, 2015

Decided and Filed: March 22, 2016

Before: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Richard A. Ripley, HAYNES AND BOONE, LLP, Washington, D.C., for Appellant. Charles J. Faruki, FARUKI IRELAND & COX P.L.L., Dayton, Ohio, for Appellees. **ON BRIEF:** Richard A. Ripley, HAYNES AND BOONE, LLP, Washington, D.C., James Alan Dyer, SEBALY, SHILLITO & DYER, Dayton, Ohio, Anne M. Johnson, Ryan Paulsen, Sally Dahlstrom, HAYNES AND BOONE, LLP, Dallas, Texas, for Appellant. Charles J. Faruki, Laura A. Sanom, FARUKI IRELAND & COX P.L.L., Dayton, Ohio, Thomas Demitrack, JONES DAY, Cleveland, Ohio, for Appellees.

MERRITT, J., delivered the opinion of the court in which DAUGHTREY, J., joined. GRIFFIN, J. (pp. 16–26),delivered a separate dissenting opinion.

---

**OPINION**

---

MERRITT, Circuit Judge.  Section 1 of the Sherman Act broadly prohibits "combinations in restraint of trade."[1]  Plaintiff claims that defendants conspired to deny it access to managed care contracts that plaintiff needed to compete in the hospital market in Dayton, Ohio.  The question in this case is whether defendants, four previously independent hospitals now operating as a hospital "network" under the name "Premier Health Partners," is a "combination" subject to liability under § 1 of the Sherman Act, or whether it should be characterized as a single entity competing in the marketplace for hospital services in the Dayton area.  The four hospitals entered into a joint operating agreement that merged[2] some of their healthcare functions, but retained control of others, and they continued to compete with each other.  The district court held that the Premier group was a single entity and dismissed this antitrust case on summary judgment without adjudicating the question of whether the behavior of the Premier group of hospitals constitutes impermissible anticompetitive conduct.  We disagree and reverse and remand for further proceedings under the Sherman Act.

## I.     Background

Plaintiff, The Medical Center at Elizabeth Place, opened in 2006 and operates a 26-bed, for-profit, physician-owned hospital in Dayton, Ohio.[3]  Plaintiff specializes in acute-care surgical services. Its competitors for surgical patients in the Dayton market include the defendant hospitals.  Defendant Premier Health Partners was formed in 1995 when two Dayton-area hospitals entered into a joint operating agreement.  Over the next 13 years, several additional

---

[1]Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

[2]A merger was not possible because one of the hospitals, Catholic Health Initiatives, Inc., was prohibited from joining a non-Catholic entity.

[3]In 2009, after struggling financially for three years, which plaintiff claims resulted from defendants' illegal boycott, plaintiff sold a 49% ownership interest to Kettering Health Network, a major competitor of defendant Premier Health Partners in the Dayton market.  The sale allowed plaintiff to gain access to Kettering's managed-care contracts with local insurance companies and thereby increase its patient volume.

hospital corporations in the area entered into Premier's joint operating agreement.[4]  Premier Health Partners, through the joint operating agreement, operates four hospitals:  Good Samaritan Hospital, Miami Valley Hospital, Atrium Medical Center, and Upper Valley Medical Center. See Second Amended and Restated Joint Operating Agreement of Premier Health Partners (executed Feb. 2008).  Premier is not a hospital, does not provide any health care itself, and has no assets of its own.  Instead, Premier handles much of the financial business of the hospitals through the joint operating agreement, including negotiating managed-care contracts with insurance carriers.  The defendant hospitals share revenues and losses through an agreed-upon formula set forth in the joint operating agreement, but each defendant maintains separate ownership of its assets.  Defendant hospitals file separate tax returns and other corporate forms and documents filed with the government.

Plaintiff claims that the hospital defendants are not a single entity, but instead a group of hospitals capable of concerted action to keep plaintiff from competing in the market.  Plaintiff offers proof that the group engaged in concerted action in three principal ways:  (1) to coerce commercial health insurers that collectively represent at least 70% of the insured consumers in Dayton to refuse to negotiate contracts for managed care with plaintiff and to otherwise deny it access to their networks, thereby depriving plaintiff of the ability to serve a large segment of the Dayton consumer market; (2) by threatening punitive financial consequences to physicians who affiliated with plaintiff, including terminating leases that physicians had with defendant hospitals for office space or terminating or evicting physicians already leasing from defendant facilities, and threatening to withhold referrals; and (3) by compelling physicians, either through threats of punitive measures or through financial incentives, to refuse to admit their patients to plaintiff hospital.

The question cannot be answered in the abstract as to whether a joint venture like the one here constitutes a single entity incapable of conspiring with itself in an anticompetitive manner, or whether, instead, it becomes a vehicle to facilitate separate entities to conspire illegally to restrain trade.  In *American Needle, Inc. v. National Football League*, 560 U.S. 183, 203 n.10

---

[4]The corporate defendants, in addition to Premier Health Partners,  are Atrium Health System, Catholic Health Initiatives, MedAmerica Health Systems Corporation, Samaritan Health Partners, and UVMC.

(2010), the Supreme Court relied on Justice Brandeis's multi-factored test in *Board of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918), to determine whether a joint venture constitutes a "combination" under Section 1:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. *To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable.* The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; *but because knowledge of intent may help the court to interpret facts and to predict consequences.*

(Emphasis added.)[5]   The summary judgment record leaves little doubt on the question of the intent of the network to prevent plaintiff hospital from entering the Dayton healthcare market. The deposition of the eventual head of plaintiff hospital contains the following testimony about a phone conversation he had with Thomas Arquilla, Executive Vice President of the Premier group of hospitals, one afternoon before the plaintiff hospital opened:

> The conversation started with him asking me the question, John, I understand that you are an investor in this new Regent Hospital [plaintiff hospital]. And I said yes, Tom, that's true. I also understand that you are the chairman of the board of the hospital. Is that true? I said yes, it's true. He said I want you to know that you are the enemy and that this is war, and you are not going to open this hospital. I replied to him are you going to kick me off of staff at Miami Valley Hospital? And he said John, I'm not going to tell you what we are going to do to you, but

---

[5]Our dissenting colleague does not agree that this statement from Justice Brandeis in *American Needle* is relevant because it discusses facts relating to defendants' intent, history and coercive behavior. The objection is strange because Justice Brandeis's admonition is quoted at length in a case where the issue was whether the defendant was a single entity. Surely if the Supreme Court had thought that Justice Brandeis's factors concerning conduct and intent were irrelevant, it would not have said they were relevant and directed lower courts to consider them. We understand that, at least on paper, the joint venture agreement, written by defendants themselves, aims to legitimate the cartel. But further factual determination is required to resolve whether the neutral words of the agreement belie the true aim of defendants' association. We are tasked with looking at the evidence before us, which includes evidence of defendants' unveiled threats to plaintiff and the words of defendants' employees and agents concerning their views on the nature of the relationship among defendants. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1150 (9th Cir. 2003) ("Defendants sabotage their theory by their own admissions. . . . Rarely do antitrust defendants serve up their own heads on so shiny a silver platter."). Our colleague's refusal to consider anything other than the joint venture agreement is tantamount to repealing Section 1 of the Sherman Act by allowing the cartel members themselves to write up the only facts to be considered.

there are many things that we can do to you, and we are going to do them.  I said Tom, are you going to blow the facility up? And he laughed, and he said I already told you, John, there's lots of things that we can do to you, and we are going to do them.  You are not going to open this hospital.  He then went on to say that our facility would suck off good paying patients, that we were going to be cherry pickers, and that we would suck off good patients.

Fleishman Dep. at 118:12-119:10 (Oct. 22, 2013).

*American Needle* sets out the framework we are to follow in deciding the "single entity" versus "concerted activity" question at issue in this appeal.  Based on defendants' stated intent to keep plaintiff out of the Dayton market, the evidence of coercive conduct threatening both physicians and insurance companies with financial loss if they did business with plaintiff, evidence of continued actual and self-proclaimed competition among the defendant hospitals, and evidence that the defendant hospitals' business operations are not entirely unitary, we conclude that there is a genuine issue of material fact as to whether the defendant hospitals' network constitutes a single entity or concerted action among competitors for purposes of Section 1 of the Sherman Act.

## II.     Analysis

The Sherman Antitrust Act is based on an often-difficult distinction between concerted and independent, unilateral action.  Concerted activity is scrutinized more closely than unilateral behavior because "'[c]oncerted activity inherently is fraught with anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.'" *Am. Needle*, 560 U.S. at 190 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)).  Specifically, Section 1 regulates concerted activity between two or more entities, outlawing "[e]very contract, combination . . . or conspiracy, in restraint of trade," 15 U.S.C. § 1, a provision that has subsequently been limited to target only "unreasonable" restraints of trade.  To prevail on a claim under § 1, a plaintiff must prove: (1) a contract, combination, or conspiracy; (2) producing adverse, anticompetitive effects in the relevant market; and (3) resulting in injury.  *See Expert Masonry, Inc. v. Boone Cty., Ky.,*

440 F.3d  336, 342 (6th Cir. 2006).  This appeal looks only at the element addressed by the district court, which is the first element:  whether defendants' conduct is the result of two or more entities acting in concert or whether defendants, based on their participation in the joint operating agreement, function as a single entity in the market place.  Our analysis is guided by *American Needle*, which sets out the standard to apply in distinguishing concerted from unilateral action.

In *American Needle*, the Court looked at the conduct of members of an incorporated joint venture that organized the 32 NFL teams for purposes of marketing the NFL trademark for apparel.  *American Needle* explained that "concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities."  560 U.S. at 191.  Rather, "substance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1." *Id*. at 195 (quoting *Copperweld*, 467 U.S. at 773 n.21).  It is not dispositive that defendants organize themselves "under a single umbrella or into a structured joint venture," *id*. at 196, as defendant hospitals did here.  The "key," according to the Court, is whether the "contract, combination . . ., or conspiracy" joins together "independent centers of decisionmaking . . . .  If it does, the entities are capable of conspiring under § 1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one." *Id*. (citation omitted).  The Court went on to hold that the 32 teams "remain separately controlled, potential competitors with economic interests that are distinct from [National Football League Properties'] financial well-being." *Id*. at 201 (citing Herbert Hovenkamp, *Exclusive Joint Ventures and Antitrust Policy*, 1995 Colum. Bus. L.R. 1, 52-61 (1995)).  Given this explanation, the Court in *American Needle* concluded that the joint venture formed by 32 NFL teams, "at least" with regard to their decision collectively to license the teams' independently owned intellectual property, was engaged in concerted rather than single-entity action and thus potentially violated Section 1.  The Court reasoned that apart from the teams' agreement to cooperate in exploiting these assets, they would be competitors in the market to produce and sell team-logo apparel and headgear by licensing their intellectual property and dealing with suppliers.

Applying *American Needle* to examine the relationship among the defendant hospitals pursuant to the joint operating agreement, we come to the same conclusion.  Like the joint

venture in *American Needle,* the joint operating agreement brings together "independent centers of decisionmaking" that "remain separately controlled, potential competitors with economic interests that are distinct" and thus are capable of concerted action.  *See* Nathaniel Grow, *American Needle and the Future of the Single Entity Defense under Section One of the Sherman Act*, 48 Am. Bus. L.J. 449, 484 (Fall 2011) ("[W]henever the entity is controlled by, or itself controls, competing economic actors, it is engaged in concerted activity rendering single entity status improper."); *see also* Areeda & Hovenkamp, *Antitrust Law* ¶ 1478a (2010) (The "most significant competitive threats arise when joint venture participants are actual or potential competitors.").

The Supreme Court looks beyond labels to recognize underlying collusion among competitors as violations of the Sherman Act.  *See Am. Needle*, 560 U.S. at 191 ("[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity."); *accord Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 594-95 (1951) (failing to "find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture'"), *overruled on other grounds by Copperweld,* 467 U.S. at 764–65; *United States v. Am. Tobacco Co.*, 221 U.S. 106, 187 (1911) (where the trust or holding company device brought together previously independent firms to lessen competition and achieve monopoly power, "the combination was in and of itself" is a restraint of trade); *see also* Federal Trade Comm'n & U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors 9 (2000) ("[L]abeling an arrangement a 'joint venture' will not protect what is merely a device to raise price or restrict output . . . .").

*American Needle* directs us to look at a number of factors when determining whether multiple parties joined together in a joint venture are functioning as a single entity for purposes of Section 1 of the Sherman Act.  We first look to the actual conduct of the parties to the joint venture:  "We have long held that concerted activity does not turn simply on whether the parties involved are legally distinct entities.  Instead, we have eschewed formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct

*actually operate*." 560 U.S. at 191 (emphasis added). The Court went on to say that in looking at how the parties actually operate, "we have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Id.* (citing *United States v. Sealy, Inc.*, 388 U.S. 350 (1967) (holding that Sealy was not a single entity, but instead an "instrumentality of the individual" parties)).

The stated intent on the part of the defendants to engage in coercive behavior, as well as conduct providing evidence of that intent, is demonstrated by the conversation recited above between the CEO of plaintiff and the Executive Vice President of Premier, in which the Premier official stated his intention to keep plaintiff from entering the Dayton healthcare market. The record also contains evidence, through letters and emails, that physicians who collaborated with plaintiff in any way lost their leases for office space in properties owned by defendants and were threatened with loss of treating privileges at defendant hospitals.

## Boycott by Health Insurance Companies

Another example of alleged conduct indicating possible anticompetitive intent on the part of defendants arises from evidence that insurance companies were refusing to deal with plaintiff at the behest of defendant hospitals. Defendant hospitals each executed separate managed-care contracts with each insurance company. Plaintiff offered evidence that defendant hospitals each individually executed managed-care contracts with the insurance companies that contained language prohibiting the insurer from also contracting with plaintiff by including an explicit restriction on the insurer's ability to add a new hospital to its network. *See, e.g.,* Email dated Aug. 10, 2009, from Mark Shaw of Premier to Renee Johnson of Premier with subject line referencing "Medical Center at Elizabeth Place" and requesting that Ms. Johnson investigate whether certain insurance companies were violating their contracts with Premier by adding new hospitals to their networks. Access to managed-care contracts offered by insurers is crucial to a hospital's financial success. The managed-care contracts with insurers provide the hospital with the volume (patients who are covered by the insurers) that is necessary to survive. If a hospital cannot contract with a number of insurers, or at least several insurers with large numbers of insureds, it is unlikely to admit enough patients, and it is only through patients that the hospital

generates revenue.  Hospitals generally seek to become "in-network" or "preferred" providers for a number of insurers, often accepting lower rates from the insurance companies in exchange for a higher volume of patients.  In this case, the forming of the joint venture, bringing the defendant hospitals under the umbrella of Premier Health Partners, facilitated negotiation with insurers for managed-care contracts.  The Federal Trade Commission and the Antitrust Division of the Justice Department recognize that "collaboration that eliminates or reduces price competition or allows providers to gain increased bargaining leverage with [insurers] raises significant antitrust concerns."  Deborah L. Feinstein, Director, Bureau of Competition, Federal Trade Commission, *Antitrust Enforcement in Health Care:  Proscription, not Prescription*, at 2, Address at the Fifth National Accountable Care Organization Summit  (June 19, 2014).  In this address, Director Feinstein also noted that "management contracts whereby one hospital manages another hospital with which it also competes may raise concerns similar to horizontal acquisitions."  *Id.* at 9.

Negotiating contracts that explicitly exclude the insurers' ability to contract with other parties is anticompetitive on its face and normally serves no proper business function, a fact recognized by the district court in its first order denying the motion to dismiss. *The Med. Ctr. at Elizabeth Place v. Premier Health Partners*, 2012 WL 3776444, at *5 (S.D. Ohio Aug. 30, 2012) ("Organizing a group boycott of [plaintiff] does not promote any legitimate objective of the [joint operating agreement] or achieve any procompetitive benefits.").  Plaintiff has submitted evidence that each insurer knew that the other insurers had included this limitation in their contracts, as demonstrated by the excerpt below from a Dayton industry publication:

> Premier has threatened to revoke privileges for physicians participating in [plaintiff hospital] and contracts with health plans such as Anthem and UnitedHealth are known to be contingent on excluding [plaintiff hospital] from the network.

HealthLeaders InterStudy, Dayton Market Overview at 7-8 (Apr. 2008).  In addition to this published account, plaintiff also offered evidence from insurance company emails and defendant hospitals' Board of Directors meetings that, in addition to demonstrating knowledge among the insurers of the restriction on adding new hospitals to their networks in their managed-care contracts with defendant hospitals, the insurance companies regularly monitored each other to

ensure that the other insurance companies were complying with the contract restriction on dealing with a new hospital.

## The Joint Operating Agreement

*American Needle* also looked to other factors in addition to actual conduct, examining the nature of the business relationship among defendants, focusing on whether that relationship remains that of separate, competing entities or whether there is a single center of decisionmaking. As noted above, Premier owns no assets and it does not provide any healthcare services. Like the joint venture under scrutiny in *American Needle,* Premier is a separate corporate entity with its own management structure, including a CEO and a Board of Directors, some of whom are employees of the individual defendant hospitals. The joint operating agreement provides for certain management functions to be carried out by Premier on behalf of the defendant hospitals. Premier's duties under the joint operating agreement are an attempt to achieve efficiencies in billing and collecting payments, managing physicians and physician groups, property management and other similar duties. *American Needle* emphasized that it is not dispositive that the parties to the joint venture have organized and created a legally separate entity that centralizes certain management functions. The Court stated that an "ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label. 'Perhaps every agreement and combination in restraint of trade could be so labeled.'" *Am. Needle,* 560 U.S. at 197 (quoting *Timken Roller Bearing*, 341 U.S. at 598). The joint operating agreement provides for some degree of unitary management, but questions remain as to whether "their general corporate actions are guided or determined by separate corporate consciousnesses." *Id.* at 196 (quotation marks and citations omitted).

The Premier joint operating agreement also provides for sharing revenue pursuant to an agreed upon formula. But, if the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel "could evade the antitrust laws simply by creating a 'joint venture' to serve as the exclusive seller of their competing products." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 335 (2d Cir. 2008) (Sotomayor, J., concurring in judgment). Indeed, a joint venture with a single management structure is generally a better way to operate a cartel because it decreases the risk that a party to

an illegal agreement will defect from that agreement. But, competitors "cannot simply get around" antitrust liability by acting "through a third-party intermediary or joint venture." *Am Needle*, 560 U.S. at 201 (internal quotations omitted).

Although joining together to carry out certain functions, defendant hospitals remain separate legal entities, each with their own assets, filing their own tax returns and maintaining a separate corporate identity with its own CEO and Board of Directors. The record also demonstrates that defendant hospitals compete with each other for physicians and patients, with each defendant hospital continuing to market certain hospital services to the public. Each of the defendant hospitals makes material independent decisions concerning their respective medical operations that are not managed by Premier, including staffing decisions and medical strategies concerning patient care.

Like the NFL teams in *American Needle*, each defendant hospital holds its own assets. Thus, the defendant hospitals only "partially" unite their economic interests, and they continue to have distinct, potentially competing interests. *See Am. Needle*, 560 U.S. at 198. Any joint venture involves multiple sources of economic power cooperating to produce a product or provide a service. The benefits of cooperation do not transform concerted action into unilateral action that puts the joint venture beyond the reach of § 1. As the Court noted, "Apart from their agreement to cooperate in exploiting those assets, . . . there would be nothing to prevent each of those teams from making its own market decisions . . . ." *Id*. at 200. Here, the defendant hospitals clearly did not completely align their interests, economic or otherwise. The defendant hospitals continue to function more or less as independent and competing hospitals that entered into the joint operating agreement largely to derive the benefit of conforming certain business practices to a uniform standard. The evidence shows that the joint venture under Premier's management is composed of individual hospitals that are separately incorporated, hold their assets separately, and compete with each other for patients. Like the NFL teams, each defendant hospital "is a substantial, independently owned" business that is "guided [by a] 'separate corporate consciousness[ ].'" *Id*. at 196 (quoting *Copperweld*, 467 U.S. at 771).

**Defendant Hospitals Continue to Compete**

The record also provides evidence that defendant hospitals continue to view themselves not as a single entity, but as competitors in the market. Defendants made statements to the public, among themselves and to a consultant hired by Premier, that demonstrate that they view themselves as separate entities. In 2010, Premier retained H*Works Consulting to help it devise a strategic five-year plan (2010-2015). One aspect of the study was to analyze the role of Premier and its relationship to its constituent elements, the defendant hospitals. As part of the process, 44 of defendants' "executives and key stakeholders" were interviewed by H*Works on a number of topics, including the integration of defendant hospitals. Pearce Fleming of H*Works conducted all of the interviews of defendants' executives, including Premier's Board of Trustees, the top level executives at Premier, and senior management from all the defendant hospitals. Fleming took contemporaneous notes of each interview, generating 11 sets of handwritten notes.

Based on these statements by defendants' top administrators, H*Works made a number of findings, including the following: "[Premier] partners do not collaborate or act as a system today, more often [Premier] partners find themselves competing with each other;" "[Premier] does not have an identity as a collaborative group, rather act as a confederacy that collaborates in a few areas (i.e., supplies, financing/access to capital, electronic medical records);" "[Premier] does not think of itself as integrated organization;" and "[Premier] Partners compete with each other for market share." H*Works Consulting, Key Interview Findings, at 8 (Apr. 2010). Specific statements from the interviews include: Premier is a "confederation of autonomous organizations" that cooperate in certain areas; "[t]he brand is the hospital, not [Premier];" defendant hospitals "do their own thing and act in their own self interest above that of [Premier];" and the joint venture structure was "designed to keep everyone separate." H*Works Consulting Interview Statements at 2-5 (Apr. 2010). The H*Works findings and interview statements set forth in its reports to Premier provide evidence that defendant hospitals uniformly agree that the they are driven to pursue individual hospital goals even after entering into the joint venture.

The district court refused to consider most of this compelling evidence, labeling it inadmissible hearsay. In refusing to consider the findings from H*Works, the district court

found the statements "incomplete, anonymous personal opinions . . . . lack[ing] any context," ruling them "inadmissible, anonymous hearsay and speculation . . . ." *The Med. Ctr. at Elizabeth Place v. Premier Health Partners,* 2014 WL 7739356, at *4 (S.D. Ohio Oct. 20, 2014). To the contrary, many of the statements were attributable to a particular person. But, whether a specific identity is given or not, it was error to exclude these statements as they are admissions of a party-opponent, admissible under the hearsay exception in Federal Rule of Evidence 801(d)(2).[6] An anonymous statement may be admissible under Rule 801(d)(2) in certain circumstances that demonstrate sufficient indicia of reliability as to the authenticity of the statement. *Davis v. Mobil Oil Expl. & Prod. Se., Inc.,* 864 F.2d 1171, 1174 (5th Cir. 1989) (holding that anonymous statement was admissible as a statement by a party's agent under Rule 801(d)(2)(D), and noting that "a district court should be presented with sufficient evidence to conclude that the person who is alleged to have made the damaging statement is in fact a party or an agent of that party . . . .").

The statements fall within the hearsay exception for admissions of party opponents under Rule 801(d)(2)(D) because the district court was presented with "sufficient evidence" to conclude that the person who made the statement is in fact "a party or an agent" of defendants. It is undisputed that the speakers, though some are unidentified by name or specific title, were all executives or "key" stakeholders of defendant hospitals. The statements were made in the scope of their employment relationship and during the existence of the joint venture. They acted within the scope of their employment in stating their views on the state of their operations and integration of those operations at the request of Premier's CEO. Thus, the sources of the

---

[6]The Rule states in relevant part:

> (d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:
>
> . . .
>
> (2) An Opposing Party's Statement. The statement is offered against an opposing party and:
>> (A) was made by the party in an individual or representative capacity;
>> (B) is one the party manifested that it adopted or believed to be true;
>> (C) was made by a person whom the party authorized to make a statement on the subject;
>> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>> (E) was made by the party's coconspirator during and in furtherance of the conspiracy

statements are identified sufficiently to establish that they were made by agents of defendants acting within the scope of and during the existence of their employment relationship. *See Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 134 (3d Cir. 1997) (holding in a similar situation that statements from unidentified executives were admissible because evidence established that though their precise identity was unknown, they were all "Westinghouse executives who had authority to make personnel decisions [and thus were] act[ing] within the scope of their employment in stating their views on the state of their workforce . . . ."). The crucial question is whether there is evidence that the unidentified declarants were speaking on a matter within the scope of their employment, not their identity. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 578 (6th Cir. 2012).

### III.    Conclusion

The gravamen of plaintiff's complaint is that in creating a joint venture, defendants colluded to keep plaintiff from competing in the Dayton hospital market through a number of avenues. The evidence of emails, letters, and the statements elicited by the consultant, together with the lack of shared assets by the defendants, raises a genuine issue of material fact as to whether defendant hospitals have "separate" corporate consciences or whether they should be considered a single entity for purposes of the antitrust laws. All of these facts suggest that defendant hospitals are actually competitors attempting to eliminate another competitor through concerted action. When viewing the record in the light most favorable to plaintiff, a reasonable juror might conclude that, aside from a business relationship pursuant to the joint operating agreement, defendant hospitals maintained separate identities and acted more like competitors than one unit. *Expert Masonry, Inc. v. Boone Cty., Ky.*, 440 F.3d 336, 341 (6th Cir. 2006) ("In this circuit, courts are generally reluctant to use summary judgment dispositions in antitrust actions due to the critical 'role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference.'")(quoting *Smith v. N. Mich. Hosp., Inc.*, 703 F.2d 942, 947 (6th Cir. 1983)).

Because plaintiff presented evidence of conduct and business operations that raise the possibility of concerted action among defendant hospitals, the question remains upon remand

whether hospitals that had previously pursued their own interests separately, and that continue to seem to compete, combined unlawfully to restrain competition.

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.   To succeed on a § 1 claim under the Sherman Antitrust Act, a plaintiff must establish that the defendants:   "(1) participated in an agreement that (2) unreasonably restrained trade in the relevant market."   *Worldwide Basketball and Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 959 (6th Cir. 2004).   Because § 1 "does not reach conduct that is wholly unilateral," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (internal quotation marks omitted), proving the first element involves a threshold showing that the defendants are separate entities capable of concerted action.   That is the only question before us:   "whether defendants . . . should be characterized as a single entity."   (Majority opinion.)

The test we apply to determine single-entity status is from *American Needle* and *Copperweld*:   whether the defendants are "separate economic actors pursuing separate economic interests," such that their agreement "'deprives the marketplace of independent centers of decisionmaking,' . . . and thus of actual or potential competition."   *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting *Copperweld*, 467 U.S. at 769).

My colleagues begin not with *American Needle* and *Copperweld*, but with the "rule of reason" as articulated in *Board of Trade of Chicago v. United States*, 246 U.S. 231 (1918)—a test that may come into play only for the second part of the inquiry—i.e., in determining whether the agreement itself constitutes an "unreasonable restraint" on trade.   *See Am. Needle*, 560 U.S. at 203 ("[T]he restraint must be judged according to the flexible Rule of Reason.") (footnote omitted); *see also Worldwide Basketball*, 388 F.3d at 959 ("Whether an agreement *unreasonably* restrains trade is determined under one of two approaches:   the *per se* rule and the rule of reason.").[1]   Reaching this issue is premature.   Because of its ruling that defendants are a single entity for § 1 purposes, the district court never considered whether defendants "participated in [any] agreement," much less an agreement to restrain trade unreasonably.

---

[1]Citing the rule of reason seems all the more misplaced here, where plaintiff alleges that defendants' conduct constitutes a *per se* violation of § 1, not a violation under the "flexible Rule of Reason." *Am. Needle*, 560 U.S. at 203.

The majority's misapplication of *American Needle* is problematic. Invoking the rule of reason steers focus to defendants' intent to avoid competition with plaintiff and away from the relevant question: whether, under the terms of their Joint Operating Agreement (JOA), defendant hospitals and their joint operating company, Premier Health Partners (Premier), share "a complete unity of interest," *Copperweld*, 467 U.S. at 771, and represent a single center of decisionmaking. I conclude they do. Thus, I would affirm summary judgment in favor of defendants and respectfully dissent.

I.

"The Sherman Act contains a 'basic distinction between concerted and independent action.'" *Id.* at 767 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)). Section 2 of the Act governs conduct by a single firm that "threatens actual monopolization," while § 1 reaches "unreasonable restraints of trade effected by a 'contract, combination or . . . conspiracy' between separate entities." *Id.* at 767–68 (quoting 15 U.S.C. § 1). Concerted activity between two parties is "inherently . . . fraught with anticompetitive risk." *Id.* at 768–69. "In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit." *Id.* at 769. As a result, the conspirators profit from increased economic power, while depriving the market "of the independent centers of decisionmaking that competition assumes and demands." *Id.*

That concern does not apply, however, when the actors share "a complete unity of interest," such as when the coordinated conduct occurs between officers and employees of the same company, or a corporation and one of its unincorporated divisions. *Id.* at 769–71. "[O]fficers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Id.* at 769. Following this reasoning in *Copperweld*, the Supreme Court held that the coordinated activity of a parent corporation and its wholly owned subsidiary "must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Id.* at 771.

Although *Copperweld* limited its inquiry to the context of parent and wholly owned subsidiary corporations, *see id.* at 767, the Court emphasized "the broader principle that substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1." *Id.* at 773 n.21. Whether two legally separate entities constitute a single actor depends upon commonality of interest, not corporate formality. Thus, "although a parent corporation and its wholly owned subsidiary are 'separate' for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they control a single aggregation of economic power. Joint conduct by two such entities does not 'depriv[e] the marketplace of independent centers of decisionmaking.'" *Am. Needle*, 560 U.S. at 194 (quoting *Copperweld*, 467 U.S. at 769).

The Supreme Court reiterated the substance-over-form analysis in *American Needle*, which involved an antitrust claim against National Football League Properties (NFLP), an organization formed by the 32 teams in the National Football League (NFL), "to develop, license, and market [each team's] intellectual property." 560 U.S. at 187. Traditionally, NFLP granted nonexclusive licenses to vendors, including American Needle, to manufacture and sell clothing bearing NFL team insignias. *Id.* In 2000, however, NFLP granted Reebok an exclusive license to sell trademarked headwear for all 32 teams. *Id.* American Needle sued, claiming the NFL, its teams, the NFLP, and Reebok violated §§ 1 and 2 of the Sherman Act. *Id.* at 187–88. Defendants NFL and NFLP asserted they were incapable of conspiring with each other "because they are a single economic enterprise, at least with respect to the conduct challenged." *Id.* at 188. The district court agreed and granted defendants' motion for summary judgment. The Seventh Circuit affirmed, noting the teams "can function only as one source of economic power when collectively producing NFL football." *Id.*

The Supreme Court reversed. Explaining the single-entity inquiry, the Court stated:

[T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved "seem" like one firm or multiple firms in any metaphysical sense. The key is whether the alleged "contract, combination . . . or conspiracy" is concerted action—that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a "contract, combination . . . or conspiracy" amongst "separate economic actors pursuing separate economic interests" . . . such that the

> agreement "deprives the marketplace of independent centers of decisionmaking," and therefore of "diversity of entrepreneurial interests," and thus of actual or potential competition.

*Id.* at 195 (citations omitted).

Applying this test, the Court ruled the independently owned NFL teams were capable of conspiring with one another. Though "*partially* unite[d]" by the fact that they all benefit from the success of the NFL brand, each team "still ha[d] distinct, potentially competing interests." *Id.* at 198. Teams compete with one another on the field for fans, for contracts with managerial and player personnel, and "in the market for intellectual property." *Id.* at 196–97. A team licensing its intellectual property "is not pursuing the common interests of the whole league but is instead pursuing interests of [the] 'corporation itself,'. . . teams are acting as 'separate economic actors pursuing separate economic interests,' and each team therefore is a potential 'independent cente[r] of decisionmaking.'" *Id.* at 197 (quoting *Copperweld*, 467 U.S. at 770) (citation omitted). The fact that the teams had formed the NFLP to market their brands through a single outlet was not dispositive. "An ongoing § 1 violation cannot evade § 1 simply by giving the ongoing violation a name and a label." *Id.*

Whether the NFLP's decisions constituted concerted action was a closer question. "This is so both because NFLP is a separate corporation with its own management and because the record indicates that most of the revenues generated by NFLP are shared by the teams on an equal basis." *Id.* at 200. Nevertheless, because each team acted for its own separate interest in making NFLP decisions, the Court held that those decisions fell within the reach of § 1. *Id.* "Thirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm's profits." *Id.* at 201. Instead, each team garnered economic benefits "separate and apart from NFLP profits as a result of the decisions they make for the NFLP." *Id.* Accordingly, because each team was acting for its own interest, and not simply the interest of the NFLP as a whole, "decisions by the NFLP regarding the teams' separately owned intellectual property constitute[d] concerted action." *Id.*

II.

As the majority states, *American Needle* "eschewed formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle*, 560 U.S. at 191. Guided by the rule of reason, my colleagues interpret this directive to mean that we should ask how defendants "actually operate" with regard to plaintiff—specifically, their intent to keep plaintiff out of the market as expressed through apparent threats by Premier's executives and the boycott defendants allegedly arranged among the insurance companies. This view is flawed. Defendants' intent to exclude others from the market is irrelevant to determining whether defendants themselves constitute a single entity. To resolve that question, we should consider how defendants "actually operate" amongst each other.

*American Needle* asks if "the [anticompetitive] agreement joins together independent centers of decisionmaking" between the defendant entities. 560 U.S. at 196 (internal quotation marks omitted). Defendant hospitals were independent centers of decisionmaking before forming Premier as their joint operating company, but the question here is whether that independence survived the creation of the joint venture; whether, when acting through Premier, defendants are "pursuing the common interests of the whole," or whether each defendant has a remaining, independent economic interest, such that it could be "pursuing the interests of [the] corporation itself," even in the course of taking joint action. *Id.* at 197 (internal quotation marks omitted). What matters then is whether defendants remain in competition *with each other,* not whether they intend to ward off competition with a third party. The Supreme Court's reasoning makes this point plain:

> Agreements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself . . . .
>
> For that reason, decisions by the NFLP regarding the teams' separately owned intellectual property constitute concerted action. Thirty-two teams operating independently through the vehicle of the NFLP are not like components of a single firm that act to maximize the firm's profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's financial well-being. Unlike typical decisions by corporate shareholders, NFLP licensing decisions effectively require the assent of more than a mere

majority of shareholders. And each team's decision reflects not only an interest in NFLP's profits but also an interest in the team's individual profits.

*Id.* at 200–01 (citations and footnotes omitted). Defendants' wish to avoid competing with plaintiff tells us nothing about whether defendant hospitals are themselves "potential competitors with economic interests that are distinct from [Premier's] financial well-being" as a whole.

III.

The best evidence of how Premier and the defendant hospitals "actually operate" is the parties' JOA. The majority concedes that the JOA vests Premier with control over the hospitals' "management functions," but insists—without discussion of the agreement's terms—that "questions remain" as to whether defendants are guided by a single corporate consciousness. Review of the JOA should resolve those questions. From the outset, the JOA identifies corporate unification as an overarching goal: "The vision of the Parties is to create and operate the JOC [joint operating company] Network as a multi-entity, integrated health care delivery system for the Miami Valley Region that is positioned for the future and not simply a continuation of the large JOC Hospitals."

Executing on that vision, the agreement creates a "unity of interest" among defendant hospitals by establishing a system of shared income:

- The JOA provides that its financial arrangements are intended to promote the functioning of Premier and defendant hospitals as an "integrated health system."

- Defendants' net incomes are totaled each year into a single "network net income," to be allocated to the parties based on predetermined percentages in the JOA.

- Defendants also share losses according to the same predetermined percentages.

Most importantly, the allocation of network net income is not linked to any individual hospital's revenue or profitability. For example, defendant MedAmerica Health Systems is entitled to 55.35% of the network net income under the JOA. Because defendants' revenues are combined in totaling the network net income, MedAmerica receives 55.35% of the profit earned from a patient regardless of whether that patient is treated at Atrium Health System, Samaritan Health

Partners, Catholic Health Initiatives, UVMC, or MedAmerica's own facility. Unlike the NFL teams in *American Needle*, who maintained "economic interests . . . distinct from NFLP's financial well-being," 560 U.S. at 201, no single hospital has any incentive to become more profitable by attracting more patients than the other.[2] The majority is therefore incorrect to say "defendant hospitals compete with each other for . . . patients." They do not.

To be sure, revenue sharing is not dispositive of single-entity status. Competitors cannot side-step antitrust liability merely by sharing revenue through a joint venture. "If the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel 'could evade the antitrust law simply by creating a "joint venture" to serve as the exclusive seller of their competing products.'" *Am. Needle*, 560 U.S. at 201 (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 335 (2d Cir. 2008) (Sotomayor, J., concurring in judgment)).

But defendants' integration is not limited to profits and losses on a balance sheet. The JOA grants Premier significant operational authority over each defendant hospital. In particular:

- It designates Premier as the "operator" for all health system activities and requires Premier to coordinate and have authority over all of those activities. Premier has general authority to operate and manage the operations of the health system activities of all defendants.

- Defendant hospitals' CEOs report to Premier's COO.

- Each defendant's management reports to Premier's executives, and Premier's system vice presidents and senior vice presidents serve at the top of each department throughout the system.

- Premier has integrated a number of system management functions among defendant hospitals, such as managed care and legal functions, into single departments for the entire system.

- The JOA grants Premier authority and control over defendants' strategic plans, budgets, and business plans.

- The JOA requires Premier to develop and oversee the implementation of a strategic plan for all system activities, and each defendant must comply with and implement the strategic plan.

---

[2]Additionally, defendants' counsel represented at oral argument that Premier sets prices for all hospital services performed by physician-employees, ensuring that each hospital charges the same price for the same service.

- It also requires Premier to develop annual capital expenditure and operating budgets for the system, and each defendant must adopt and implement the budget approved for it by Premier.

- Premier's CEO has the power to remove each defendant hospital's CEO.

- Premier controls defendant hospitals' material debt incurrence and negotiates and manages their relationships with insurance companies.

Although each defendant hospital retains its separate corporate existence, along with the right to amend or repeal their corporate governing documents, the JOA requires them to "take all corporate action . . . as required to implement" Premier's authority. Defendants are also prohibited from modifying corporate documents in a manner inconsistent with the JOA without prior approval. To the extent defendant hospitals' corporate documents conflict with the JOA, the JOA controls.

The majority's reply that "defendant hospitals remain separate legal entities . . . [each] filing their own tax returns and maintaining a separate corporate identity with its own CEO and Board of Directors" is beside the point. Finding an issue of fact on these grounds elevates form over substance. "[T]he question is not whether the defendant is a legally single entity or has a single name"; rather, the question is one of functional reality. *Am. Needle*, 560 U.S. at 195. And the functional reality is that the JOA unifies defendant hospitals under Premier's flagship.

That reality is not changed by the fact that the hospitals maintain individually-owned assets. Neither *American Needle*, nor *Copperweld*, discusses the role of asset ownership as part of the single-entity inquiry. Yet the majority makes a point of quoting the single mention of "assets" in *American Needle*: "NFLP's licensing decisions are made by the 32 potential competitors, and each of them actually owns its share of the jointly managed assets. Apart from their agreement to cooperate in exploiting those assets, including their decisions as the NFLP, there would be nothing to prevent each of the teams from making its own market decisions relating to purchases of apparel and headwear, to the sale of such items, and to the granting of licenses to use its trademarks." *Id.* at 200 (citation omitted).

This language does not establish that asset ownership is important to the single-entity inquiry. Viewed in context, the Court's mention of assets is merely a reiteration of its primary

holding; "there would be nothing to prevent each of the [NFL] teams from making its own market decisions" because they remained independent centers of decisionmaking capable of acting on separate economic interests—even while making joint decisions through the NFLP:

> The 32 teams capture individual economic benefits separate and apart from NFLP profits as a result of the decisions they make for the NFLP. NFLP's decisions thus affect each team's profits from licensing its own intellectual property. "Although the business interests of" the teams "will *often* coincide with those of the" NFLP "as an entity in itself, that commonality of interest exists in every cartel." In making the relevant licensing decisions, NFLP is therefore "an instrumentality" of the teams.

*Am. Needle*, 560 U.S. at 201 (citations omitted). Here, by contrast, defendant hospitals are not capable of acting on separate economic interests. All of their profits are shared as part of the network net income. They do not "capture individual economic benefits separate and apart from" that income. *Id.* Individual ownership of assets carries little weight when all the economic benefit of those assets is mutually shared. Defendant hospitals are also distinguishable from the teams in *American Needle* by virtue of their decision to cede substantial operational control over to Premier. Consequently, there is something to prevent them from making "[their] own market decisions" wholly "[a]part from their agreement to cooperate in exploiting [their individually-owned] assets." *Id.* at 200.

To the extent that asset ownership matters, it must be evaluated as part of *American Needle*'s "functional analysis," *id.* at 192, which in this case directs us back to the JOA. The JOA grants Premier substantial control over the defendant hospitals' individually-owned assets—a fact the majority does not address. Defendant hospitals are prohibited from "sell[ing], convey[ing], transfer[ring], or otherwise dispos[ing] of any material asset used in JOC Activities" to any entity other than a fellow defendant hospital without Premier's prior approval. Further:

- It gives Premier authority to use any of defendant hospitals' resources, facilities, or supplies for the system's activities.

- Plaintiff cited no evidence to dispute defendants' claim that Premier has, in fact, consolidated programs, moved equipment between facilities, and limited procedures occurring in certain facilities.

- The JOA also authorizes Premier to assess costs to the hospitals for implementation of new technologies and programs—including building, equipment acquisition, and training costs—and Premier exercises that authority.

Functionally, defendant hospitals own their assets in name only, without deriving any individual benefit from those assets. Defendants' inability to manage their own assets should therefore serve as another marker of Premier's centralized control—not a fact that brings their corporate unification into question.

IV.

In addition to defendants' anticompetitive intent, and individually-owned assets, the majority finds that the anonymous H*Works statements are evidence "that defendant hospitals continue to view themselves . . . as competitors in the market." I disagree.

Setting aside the question of admissibility, this evidence does not create a genuine issue of material fact. "When the moving party has carried its burden . . . , its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote and citation omitted). While we may reasonably infer that the issue of economic integration was within the scope of employment for some of the 44 "executives and key stakeholders" involved in the H*Works project, the circumstances surrounding the statements do not prove that the statements are related to that issue.

The purpose of the H*Works project was to help Premier "devise a strategic five-year plan," and "analyze the role of Premier and its relationship to . . . defendant hospitals." (Majority opinion.) According to plaintiff, defendants "hoped to . . . improve strategic integration, coordination, systems thinking and market leverage"—goals that involve more than just economic integration. The variety of topics addressed in the H*Works statements confirms as much; they include thoughts on creating a more "patient centered approach," Premier's need to "expand to other communities," and complaints from doctors that Premier "must answer the 'what's in it for me' question for physicians and prove it to them."

The JOA establishes "control[] by a single center of decisionmaking [i.e., Premier]," as well as "a single aggregation of economic power." *Am. Needle*, 560 U.S. at 194. Defendants have therefore carried their burden to establish an overall unity of interest. Plaintiff has not rebutted the factual basis for defendants' motion. Considered in context, the H*Works statements cast no more than a "metaphysical doubt" upon that unity. Thus, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," and "there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

V.

Defendants' alleged conduct in this case, if proven at trial, is indeed anticompetitive. But the Sherman Act does not proscribe unreasonable restraints on trade by a single entity; "it leaves untouched a single firm's anticompetitive conduct (short of threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability." *Copperweld*, 467 U.S. at 775. "Congress left this 'gap'" purposefully, "for eminently sound reasons." *Id.* A prohibition against independent action "that merely restrains trade . . . could deter perfectly competitive conduct by firms that are fearful of litigation costs and judicial error." *Am. Needle*, 560 U.S. at 190 n.2. Regardless of their intent to keep plaintiff out of the market, defendants have demonstrated a complete unity of interest and a single center of decisionmaking. "Unless we second-guess the judgment of Congress to limit § 1 to concerted conduct," *Copperweld*, 467 U.S. at 776, we are without authority to check them.

For these reasons, I respectfully dissent. I would affirm the judgment of the district court.